FINCK et al., Trustees, Appellants, v. SCHNEIDER GRANITE COMPANY.

Division One, March 15, 1905.

1. **Combination: Corporation: Collateral Attack.** The validity of the organization of a corporation, whose articles of association on their face comply with the law and bear evidence that the organization is for a legal purpose, may be collaterally attacked, if such organization grew out of an unlawful conspiracy between various companies to control the output and prices of an article of public necessity and to crush out all healthy competition.

2. ————: **Contract.** A contract which standing alone may be legal, may nevertheless be illegal if it is one of several others all of which are links and necessary links in an illegal combination and monopoly intended to work and which does work a public injury in unduly raising prices so long as it holds together.

3. ————: **Illegal: Statute.** Four corporations and a firm, being all the dealers in crushed granite in St. Louis and at the only

point in the State and within 500 miles of St. Louis where such granite for concrete sidewalk uses was produced, organized a corporation, with their chief officers as the sole stockholders, for the purchase and sale of crushed granite, with a nominal capital of $2,000, at a time when the city by ordinance had required a large amount of concrete sidewalk to be constructed, and all five concerns entered into separate agreements with it to sell to it at an agreed price all the crushed granite they sold, and if they sold to any other person they were to pay it as a penalty one dollar for each ton sold, and this suit is to recover the penalty from one company which violated the agreement. The price of crushed granite immediately on the execution of the agreements went up eighty cents per ton and was so maintained while the agreements were adhered to and again fell off that much when defendant refused longer to be bound by it. The nominal company had nothing to do except receive orders for crushed granite, transmit them to the companies, collect the amounts, and pay them over to the companies. *Held*, that the agreements were each necessary links in a combination, and that the combination was illegal under the statutes of 1889 and 1891, and the agreements void.

4. ———: ———: ———: **Constitutional.** The statutes of 1889 and 1891 against illegal combinations, conspiracies, etc., in restraint of trade, etc., are constitutional. The case of State ex rel. v. Simmons Hardware Co., 109 Mo. 118, only declared invalid those provisions of the statute of 1889 which required a corporation by its sworn return to accuse itself, and that provision being easily separable from the main body of the law its invalidity did not affect the validity of the rest.

5. ———: **Contracts in Restraint of Trade: Retroactive Law: Police Power.** Where the contract is a continuing one and even a legal one when made, to declare it illegal under a statute which is a valid exercise of the police power, enacted after the execution of the contract, is not to give the statute a retroactive effect. No one has any vested right which he can claim is exempt from the lawful exercise by the State of its police powers. Everyone holds his property rights subject to such lawful exercise. If the contract made before the enactment of the statute results in a combination or conspiracy to increase prices or to create a monoply in the article, the statute may be used to prohibit the enforcement of the contract.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

AFFIRMED.

*George W. Lubke* for appellants.

(1) The demand of the St. Louis Crushed Granite Company against the Schneider Granite Company for breach of contract was an asset of the St. Louis Crushed Granite Company which passed to its directors as trustees when the charter of the company expired; and John C. Finck, Jr., Philip F. Stifel and Gottlieb Eyermann, Jr., being at that time the directors of that company, they became entitled to this demand and were properly substituted as plaintiffs in this case regardless of the time when this suit was begun. R. S. 1899, secs. 976, 2513; Ward v. Pine, 50 Mo. 38; Raines v. Lumpe, 80 Mo. App. 203; Williams v. Railroad, 153 Mo. 487. (2) The charter granted to the St. Louis Crushed Granite Company by the State authorized the company to buy and sell crushed granite "and generally to transact such business as is incident thereto including the right to contract for the purchase and sale of said articles and handling the same on commission." The statute then and now still in force authorized the formation of corporations for manufacturing and business purposes "intended for pecuniary profit or gain not otherwise especially provided for and not inconsistent with the Constitution and laws of this State." R. S. 1899, sec. 1319. And the referee and court below both erred in ruling that the St. Louis Crushed Granite Company had not a legal existence or legal capacity to enter into the contract with the Schneider Granite Company whereby the latter agreed for five years thereafter to sell and deliver to the former all the crushed granite output of the Schneider Granite Company; and in upholding defendant's plea that the purposes of the St. Louis Crushed Granite Company were unlawful, and erred in holding that the contract was illegal. (a) Questions as to the validity of a charter can only be raised by the State in direct *quo warranto* proceedings. This has been the rule in Missouri since the decision of

the Federal Supreme Court which overruled Mathews v. Skinker, 62 Mo. 329. Bank v. Mathews, 98 U. S. 621; Thornton v. Bank, 71 Mo. 221; Bank v. Gillilan, 72 Mo. 77; Bank v. Hunt, 76 Mo. 439; St. Louis Drug Co. v. Robinson, 81 Mo. 26; Bank v. Porter, 52 Mo. App. 244. And the defendant company having received the benefits of the contract for seven months was thereby estopped from questioning the corporate existence or the legal capacity of the St. Louis Crushed Granite Company to make the contract, or the validity of the contract itself. Weyrich v. Grand Lodge, 47 Mo. App. 391; Kitchen v. Railroad, 69 Mo. 226; Schilling v. Schneider, 110 Mo. 83; Feld v. Inv. Co., 123 Mo. 603. (b) The first statute of Missouri relating to pools, trusts and conspiracies was approved May 18, 1889, to go into effect at once. Laws 1889, pp. 96-98, R. S. 1889, chapter 128. It was so faulty that the first attempt to enforce it by *quo warranto* proceedings failed. State ex rel. v. Simmons Hardware Co., 109 Mo. 118. And it was repealed without any reservations by the act of April 2, 1891, relating to pools and trusts. The later act had no emergency clause and did not, therefore, go into effect until June 22, 1891. Laws 1891, p. 226. It had and could have no retroactive effect; and did not and could not relate back to or affect the validity of the contract of March 5, 1891, between the St. Louis Crushed Granite Company and defendant Schneider Granite Company, or the other four contracts of the Crushed Granite Company with different plants. The Constitution of the State forbade the passage by the General Assembly of any law "impairing the obligation of contracts or retrospective in its operation." Sec. 15, art. 2, Bill of Rights. This rule was applied in Missouri in a case where a special statute authorized a plea of forfeiture of the charter of plaintiff. A later statute repealed this special one and the court held that the repeal did not destroy any vested right, and that after the repeal the forfeiture could be

taken advantage of only by a direct proceeding. Bank v. Snelling, 35 Mo. 190. And in a later case it was held that where a witness had become disqualified from testifying because of his conviction of crime, his competency to testify was restored by the repeal of the law under which he was convicted. State v. Grant, 79 Mo. 113. The repeal of a statute without any saving clause leaves the law in force as it was before the enactment of the repealed statute, and although suit is pending the repeal controls it. Endlich on Interpretation of Statutes, sec. 479; Yeaton v. United States, 9 U. S. 281; Maryland v. Railroad, 44 U. S. 534; Norris v. Crocker, 54 U. S. 429; Pope v. Lewis, 4 Ala. 487; Lewis v. Foster, 1 N. H. 61. A contention that the contract here sued on was destroyed by the law of 1891 as a police regulation is also not tenable in this State. A direct parallel to the case at bar is the Missouri Lotteries case. State v. Miller, 50 Mo. 129; Leete v. State Bank, 115 Mo. 184, 141 Mo. 574; Clay v. Mayr, 144 Mo. 376; State ex rel. v. Greer, 78 Mo. 188. (c) The contract sued on, together with those made with the four other parties, could not and can not be held invalid at common law on the ground of monopoly, or as being in restraint of trade or for any other reason in the absence of an express statute invalidating them. Presbury v. Fisher, 18 Mo. 50; Peltz v. Eichele, 62 Mo. 171; Wiggins Ferry Co. v. Railroad, 73 Mo. 389; Gill v. Ferris, 82 Mo. 156; State ex rel. v. Asso. Press, 159 Mo. 410; Skrainka v. Scharringhausen, 8 Mo. App. 522; Clark v. Frank, 17 Mo. App. 602; Natl. Lead Co. v. Grote Paint Co., 80 Mo. App. 247; Stearns v. Barrett, 1 Pick. 443; Palmer v. Stebbins, 3 Pick. 188; Pierce v. Woodward, 6 Pick. 206; Alger v. Thatcher, 19 Pick. 53; Nobles v. Bates, 7 Cow. 307; Beard v. Dennis, 6 Ind. 200; Wintz v. Vogt, 3 La. Ann. 16; Oakdale Mfg. Co. v. Garst, 18 R. I. 484; Cohen v. Env. Co., 56 N. Y. Supp. 588; Leslie v. Lorillard, 110 N. Y. 519.

*Dickson, Smith & Dickson* for respondent.

(1) The combination created by the contract involved in this case is against the anti-trust laws of Missouri. State ex rel. v. Armour Packing Co., 173 Mo. 356; National Lead Co. v. Grote Paint Store Co., 80 Mo. App. 247; Walsh v. Association of Master Plumbers, 97 Mo. App. 280; State v. Fireman's Ins. Co. 152 Mo. 1; Heim Brewing Co. v. Berlinder, 97 Mo. App. 64; Ford v. Chicago Milk Shippers' Assn., 155 Ill. 166; Anheuser-Busch Brewing Co. v. Houck, 30 S. W. 869; Coal Co. v. Lanson, 34 S. W. 920; Beechley v. Mullville, 70 N. W. 107; B. R. Co. v. Templeman, 38 S. W. 27; Fuqua v. Pabst Brewing Co. 38 S. W. 29; Texas B. Co. v. Meyer, 38 S. W. 263; Merz Capsule Co. v. U. S. C. Co., 67 Fed. 414; U. S. v. Freight Association, 166 U. S. 290; Ertz v. Produce Exchange, 84 N. W. 743; In the matter of Davies, 168 N. Y. 191; Cleland v. Anderson, 92 N. W. 306; Commonwealth v. Bavarian B. Co., 66 S. W. 1016; Canning Co. v. Joulian, 80 Miss. 555; article "Regulation of Trusts," 51 C. J. L. 45. (2) The combination created by the contract, which is the subject-matter of this action, is violative of the Federal Anti-trust Act of July 2, 1890. U. S. v. Addyston Pipe & Steel Co., 29 Cir. Ct. App. 141, affirmed in U. S. v. Addyston Pipe & Steel Co., 175 U. S. 211; U. S. v. Freight Assn., 166 U. S. 290; Gibbs v. McNeeley, 55 C. C. A. 70; Montague v. Lowry, 52 C. C. A. 621; U. S. ex rel. v. C. & O. Fuel Co., 105 Fed. 93, affirmed 115 Fed. 610; U. S. v. Swift, 122 Fed. 529; U. S. v. Northern Securities Co., 120 Fed. 721. (3) The combination created by the contract in this case is void under the common law, with respect to monopolies and contracts in restraint of trade. Distilling & Cattle Feeding Case, 41 N. E. 188; Foss v. Cummings, 36 N. E. 555; More v. Bennett, 29 N. E. 888; Griffin v. Piper, 55 Ill. 213; Am. Straw Board Co. v. Peoria Straw Board Co., 65 Ill. App. 502; Craft v. Mc-

Conoughy, 79 Ill. 346; Distilling Co. v. People, 156 Ill. 448; Harding v. American Glucose Co., 182 Ill. 551; Ford v. Chicago Milk Shippers' Assn., 155 Ill. 166; Nester v. Brewing Co., 161 Pa. St. 473; Morris Run Coal Co. v. Coal Co., 68 Pa. St. 173; Richardson v. Buhl, 43 N. W. 1110; Bingham v. Brand, 77 N. W. 940; Western Woodenware Ass'n v. Starkey, 84 Mich. 76; Consumers Oil Co. v. Hennemacher, 142 Ind. 564; Anderson v. Jett, 12 S. W. 670; Emery v. Ohio Candle Co., 24 N. E. 660; State v. Standard Oil Co., 30 N. E. 279; Central Salt Co. v. Guthrie, 35 Ohio St. 666; Chapin v. Brown, 48 N. W. 1074; Mill Co. v. Haynes, 76 Cal. 387; Vulcan Powder Co. v. Powder Co., 96 Cal. 510; Pacific Co. v. Adler, 27 Pac. 36; Bailey v. Assn. of Master Plumbers, 52 S. W. 845; Texas S. C. Co. v. Adoue, 19 S. W. 274; India Bagging Co. Assn. v. Cock, 14 La. Ann. 168; Arnett v. Pittson Co. 68 N. Y. 565; People v. Milk Exchange, 145 N. Y. 267; Drake v. Siebold, 81 Hun 178; DeWitt Wire Cloth Co. v. N. J. Wire Co., 14 N. Y. Supp. 277; Judd v. Harrington, 19 N. Y. Supp. 406; People v. Duke, 44 N. Y. Supp. 336; Cumming v. Union Blue Stone Co., 44 N. Y. Supp. 787; P. C. Co. v. McMillan,119 N. Y. 46; Irmston v. Whitlegg Bros., 63 Law Times 455; Tiedeman on Commercial Paper, sec. 190; U. S. v. Knight, 156 U. S. 116; Fox Solid Steel Co. v. Schoen, 77 Fed. 29; National Herald Co. v. Hench, 76 Fed. 667; National Herald Co. v. Quake, 67 Fed. 130. (4) The original anti-trust act of Missouri in its substantial features was in force when the contract involved in this case was entered into, but whether it was in force or not is immaterial for the reason that when the act of 1891 came into effect it applied to all contracts violative of its terms, entered into before the passage of the act, as well as those that might be entered into subsequent thereto. Freight Assn. Case, 166 U. S. 342; Fox v. Chicago Milk Shippers' Assn., 115 Ill. 166; In the matter of Davies, 168 N. Y. 191. (5) Where the consideration of a contract is illegal, in whole or in part, it is imma-

terial whether the illegality is disclosed by the contract or shown *aliunde,* the entire contract is defeated. Garrett v. Mining Co., 113 Mo. 333; Attaway v. Bank, 93 Mo. 485; Bick v. Seal, 45 Mo. App. 475. (6) Where the thing contracted for becomes unlawful, performance becomes impossible by the law, and non-performance is excusable. Sauner v. Ins. Co., 45 Mo. App. 480; Pollock on Contracts (Addison's Notes), n. 352; Engleman v. Skrainka, 14 Mo. App. 439. (7) If plaintiff in making his case is bound to show an illegal transaction, he can not recover. Parsons v. Randolph, 21 Mo. App. 353; Harrison v. McCluney, 32 Mo. App. 481.

BRACE, P. J.—This is an appeal from a judgment of the St. Louis City Circuit Court in favor of the defendant, from which the plaintiffs appeal.

By consent the cause was "referred to James A. Seddon, Esq., to try all the issues involved therein and report his proceedings to the court."

Upon the coming in of his report, exceptions thereto were filed, which having been duly considered, were overruled, the report confirmed and the judgment rendered, from which plaintiffs appeal.

The report of the referee is as follows:

"FINDINGS OF FACT.

"The referee makes the following findings of facts:

"Crushed granite is chiefly used in the construction of granitoid sidewalks or streets. In this construction it is an essential element. Such sidewalks are of recent origin. Crushed granite is manufactured by crushing in mills fragments of granite, technically called 'spawls.' In 1891 and during the whole period covered by the controversy in this case, the only source of the supply of spawls for the market of the city of St. Louis was the southeastern portion of the State of Missouri, adjacent to the Iron Mountain Railroad. Indeed, there was no other granite proper for making crushed gran-

ite within five hundred miles of St. Louis. All of the spawls crushed and crushed granite sold in St. Louis came over that railroad and into its depot in that city. The city of St. Louis was the market for crushed granite for the State of Missouri and portions of other States lying east of the Mississippi river. Crushed granite was sold from the market of St. Louis to Chicago, Cincinnati and points in Illinois, Indiana, Kentucky and Tennessee. During this period spawls were worth at the quarries in southeast Missouri about sixty-seven and one half cents. The freight to St. Louis was about eighty cents. The market price of spawls in the St. Louis market was about $1.47 1-2 cents. This price would vary slightly from time to time. In the early part of the year 1891, and just preceding March, 1891, crushed granite was worth in the St. Louis market in carload lots, free on board the cars at the Iron Mountain depot of the Iron Mountain Railway Company, on an average of $2.25 per ton, which price would slightly vary according to the demand. At the prices prevailing in the St. Louis market prior to March, 1891, there was a fair, reasonable and living profit to those engaged in the manufacture and sale of crushed granite. Competition was lively and keen but healthy, and the business was active and on a good basis. Prior to March, 1891, the following were the only parties owning crushing mills engaged in the business of manufacturing and selling crushed granite in the St. Louis market; that is to say:

"The Schneider Granite Company (a corporation, Philip W. Schneider, president), whose crusher was at Graniteville, Missouri, on the Iron Mountain Railroad in the southeastern portion of the State.

"Finck Milling Company (a corporation, John C. Finck, Jr., president), whose mill was situated in St. Louis.

"The Pickel Granite Crushing Company (a corporation, George Pickel, president), whose crusher was in St. Louis.

"Eyermann & Schmalz (a firm, composed of Gottlieb Eyermann, Jr., and ——— Schmalz), whose crusher was at ———.

"Stifel and Ruckert (a firm composed of Philip W. Stifel and ——— Ruckert), whose crusher was situated at Graniteville, Missouri.

"P. M. Bruner, whose crusher was in St. Louis.

"Milne & Gordon, whose crusher was in St. Louis.

"Bruner was engaged largely in the business of constructing sidewalks and other granitoid work in St. Louis. He was a large contractor and practically consumed all of the crushed granite which was manufactured by himself.

"Milne & Gordon were small manufacturers and manufactured about sixty tons of crushed granite a day during the crushing season.

"In May, 1891, after the combination hereinafter referred to, John J. Steffen, a contractor, erected a mill in St. Louis for crushing granite. He consumed his product. He had made in 1890 a $50,000 contract for the construction of granitoid work in the year ending July 1, 1891. He relied upon being able to purchase, as he had always done, at competitive rate, the crushed granite which he would need to fill his contract. But after the said combination went into effect on March 5, 1891, he was notified by Mr. George Pickel that his company could not deliver any more granite at former prices, and he was not able to get the granite necessary to fill his contract at the former prevailing prices. Being met with a sudden and arbitrary increase in the price of material, to save himself a large financial loss he erected as aforesaid, in May, 1891, a mill to supply his own consumption. The average daily output of crushed granite in 1891, prior to March of that year, in St. Louis, for the open market was from 800 to 1,000 tons daily. Of this Milne & Gordon furnished from 50 to 60 tons a day. The rest was furnished by the first five of the above-named manufacturing concerns, to-wit, Schneider Gran-

ite Company, Finck Milling Company, Pickel Granite Crushing Company, Eyermann & Schmalz, and Stifel & Ruckert.

"Should these five parties combine to put prices up arbitrarily they could easily do so, as they manufactured nearly all of the crushed granite sold in the city of St. Louis. In the early part of 1891 it was obvious to these parties that the city of St. Louis was on the eve of a large expansion in the construction of street sidewalks. The city had adopted an ordinance under which a large amount of such work of a public nature would have to be done. There had also been projected numerous large subdivisions and additions to the city of St. Louis, such as Chamberlain Park and others, intended to be put upon the market for sale for residence purposes. These called for a large amount of sidewalk construction in the immediate future. These five concerns realizing these conditions fully, and that they could by combining together arbitrarily raise the price of crushed granite to those who should absolutely need it, confederated together and concocted a scheme for combining together to arbitrarily control and maintain the price of crushed granite in the market of the city of St. Louis, prevent natural and healthy competition and realize a practical monoply of the market of St. Louis in restraint of trade. In pursuance of this scheme they agreed together to form a corporation which should have a capital stock of $2,000. The capital was merely nominal and quite inadequate for the professed purposes of the intended organization. Philip W. Schneider, Philip F. Stifel, George Pickel, Gottlieb Eyermann, Jr., and John C. Finck, Jr., were to become incorporators of the company, each as the representative of his business concern. These concerns were in reality to own the stock. These different firms and corporations were to make contracts with the company, agreeing to sell all of their product of crushed granite for the next five years to the company at the stipulated sum of $2,

and were to agree not to sell spawls to anyone not in
the combination, except at a penalty which would be
prohibitory, the purpose being to diminish the chance
or altogether prevent other parties from building crush-
ing mills, and entering into competition with them. This
agreement was to be enforced by prohibitory penalty of
$1.50 per ton imposed for every ton of crushed granite
which should be sold to outsiders.  The sales of crushed
granite were to be made by the different members of
the combination to the public as theretofore, but the
sales were to be made in the name of the St. Louis
Crushed Granite Company.  The only business which it
was contemplated that the company should do was pure-
ly routine, to keep a set of books, to record the sales,
to receive the moneys realized therefrom, and to divide
the profits of the combination amongst the parties inter-
ested in the proportion to the stock held by each of
them.  It was contemplated that all the business of the
company could be done by one person, a secretary. The
avowed purpose of these parties was to improve their
condition by arbitrarily raising the price of crushed
granite in the market in the city of St. Louis, which
meant the whole of Missouri and the neighboring mar-
kets in other States which were supplied by the St.
Louis market.

"In pursuance of this scheme of confederacy, Phil-
ip F. Stifel, representing the firm of Stifel & Ruckert;
Philip W Schneider, representing his corporation, the
Schneider Granite Company; George Pickel, represent-
ing his corporation, the Pickel Granite Crushing Com-
pany; Gottlieb Eyermann, Jr., representing his firm of
Eyermann & Schmalz, and J. C. Finck, Jr., represent-
ing his corporation, the Finck Milling Company, as in-
corporators, organized and incorporated a corporation
under the laws of Missouri, relating to business corpor-
ations, under the name 'St. Louis Crushed Granite Com-
pany,' with a capital of $2,000, divided into five shares
of $400 each.  Each of these five persons appeared in

the articles of association as a subscriber to one share of the par value of $400. The articles of association recited that one-half of the capital stock had been paid up in lawful money of the United States, and that it was in the custody of the persons named as the first board of directors. Immediately after the formation of the corporation, it was agreed amongst all of the stockholders that they should retain the first fifty per cent of the capital stock until the same should be called for. The object of the corporation was set forth in the articles of incorporation as follows:

" 'The object, purpose and business for which this corporation was formed shall be the buying and selling of crushed granite and generally to transact such business incident thereto, including to contract for the purchase and sale of said articles and handling the same on commission.'

"The certificate of the Secretary of State was dated the third day of March, 1891. The charter provided that the company should exist for the period of five years only. Each of the incorporators endorsed on the certificates of stock which were issued to him a declaration to the effect that he held the stock as trustee for the business concern, of which he was a member, and which he represented in the corporation. The dividends which were declared were received by the above incorporators and were paid to their respective business concerns. The following contract was made on the fifth day of March, 1891, between the St. Louis Crushed Granite Company and the Schneider Granite Company:

" 'This agreement entered into in duplicate this fifth day of March, A. D. 1891, at the city of St. Louis, State of Missouri, by and between the St. Louis Crushed Granite Company, a corporation, under the laws of Missouri, party of the first part, and Schneider Granite Company, a corporation, of the city of St. Louis, party of the second part, witnesseth:

" 'That, whereas, said party of the first part has

been incorporated with authority to buy, sell and generally to deal in crushed granite, upon its own account, and also on commission for others; and whereas, said party of the first part has offered to purchase from said party of the second part all the crushed granite which said party of the second part during the period of five years after the date hereof may crush at the plants of said party of the second part situated near Graniteville, Iron county, Missouri, and whereas, said party of the second part has accepted said offer; now, therefore, said parties have mutually agreed upon the following prices, terms, conditions and penalties in the matter of the performance of said contract between them, namely:

" 'That the said party of the second part will sell and deliver such crushed granite during said period of five years, upon the orders of said party of the first part, at such of the places hereinafter mentioned as the party of the first part may from time to time require at the following prices, that is to say: at $2.00 per ton free on board cars in Iron Mountain Railroad Company's yards, St. Louis, or at $1.00 per ton, free on board cars, at crusher, near Graniteville, Iron county, Missouri.

" 'And said party of the first part agrees to pay the party of the second part in cash at the prices aforesaid on the twentieth day of every month for all granite delivered by the party of the second part as aforesaid, the preceding month.

" 'The said party of the first part also agrees to order from the party of the second part from time to time during the period aforesaid of the entire quantities of said articles which said party of the first part may need in its business from time to time an amount equal to the numerical proportion which this contract may bear to the whole number of like contracts which said party of the first part may have made in good faith and which may be in force with responsible proprietors of other granite plants; and the party of the second part

agrees to meet and comply with all such orders. And if at the end of said five years the party of the second part have on hand in its said plants any crushed granite, the party of the first part will take the same and pay therefor the prices aforesaid. The party of the second part also agrees as part of the consideration to the party of the first part for making this contract, that said party of the second part will account with and pay over to the party of the first part in the monthly settlements the sum of $1.50 per ton for all spawls to be turned into crushed granite, where the same is used with cement, which during the preceding month may have been sold and delivered by the party of the second part from the plants aforesaid except that such payment will not be made for spawls which may have been sold to anyone with whom the party of the first part has an existing contract like this one.

" 'And finally it is expressly understood between said parties that the neglect or failure after reasonable notice of the party of the second part to perform this agreement in respect of deliveries of crushed granite (excepting only when caused by strikes, fire or disabling injury to plant) shall entitle the party of the first part to demand and receive in the monthly settlements from said party of the second part penalty equal to fifty cents per ton for the first ten days and one dollar per ton thereafter on all crushed granite which the party of the second part may have neglected to furnish when required as aforesaid, and the said penalty shall continue chargeable until said party of the second part resumes making deliveries.

" 'In witness whereof said parties have executed this instrument, the party of the first part acting herein under a resolution of its board of directors, by the signature of its president with its corporate seal attached; and the party of the second part by

" 'SCHNEIDER GRANITE COMPANY,
" 'PH. W. SCHNEIDER, Prest.

" 'Schneider Granite Company, (Seal)
  " 'ST. LOUIS CRUSHED GRANITE Co.,
        " 'Per J. C. FINCK, JR., Prest.
    " 'Attest: JULIUS A. SCHNEIDER, Secy.'

"The penalty of $1.50 per ton for selling spawls was prohibitory. No one could sell them and pay the penalty without serious financial loss. The provision was tantamount to a provision not to sell the spawls to outsiders.

"The same contract was made on the same day by the St. Louis Crushed Granite Company with the four other firms and corporations represented in the scheme and combination. They sold crushed granite as they did prior to the formation of the corporation, except that it was a rule that the sales were to be made in the name of the company, which rule, however, was not always observed and the sales were not always promptly reported to the company. The company was forced to issue circulars to the trade directing purchasers to pay direct to the company. The company had no depot or yards of its own for crushed granite. Three of the yards or depots of the members of the corporation were situated in the west end of the city along the Missouri Pacific tracks in the neighborhood of Grand avenue, a principal thoroughfare north and south, near each other, and the other two were situated on Barton street in the southern portion of the city opposite to each other. Deliveries were made from these yards, as it proved most convenient to the company. The company owns no crushers, and was not engaged in the active business of manufacturing crushed granite. It kept an office which consisted of one room with telephone and fixtures. Its business was of a routine nature and was transacted by one person, its assistant secretary, who received a salary which was for part of the time $100, and for the rest of the time $75 a month. He received the reports of the sales made by the different firms and corporations in the combine, collected the money accruing from

such sales, and entered these items in the books. With the exception of fixing the prices of crushed granite this was substantially all the business which the company transacted. It existed merely as a cover or agency under which the scheme to raise prices was worked out. It was a mere agency for distributing the profits of the scheme to its different members operating under the corporate name. Immediately upon its organization, the company passed a resolution arbitrarily fixing the price of crushed granite in the city of St. Louis at a price averaging about eighty cents above the then prevailing market rate, according to the place of delivery and the required haul. As a result the price of crushed granite immediately advanced in the market of the city of St. Louis correspondingly. This was an arbitrary price which was established and maintained by reason of the combination and not as a result of natural, normal competition. There was practically no competition after it went into effect and as long as this combination existed. On the nineteenth of October, 1891, the defendant, the Schneider Granite Company, withdrew from the combination and began to manufacture and sell crushed granite on its own account in large amounts in the market of St. Louis. The price of crushed granite in the market immediately thereafter dropped to its former price existing before the combination went into effect.

"On October 26, 1891, the St. Louis Crushed Granite Company found it necessary to reduce the price of its product to the prices prevailing before March, 1891, in order to meet the competition. The referee finds that those in this combination were able to raise and did arbitrarily raise the price of crushed granite on the average of about eighty cents a ton in the open market of St. Louis during the period from the fifth day of March, 1891, to the nineteenth day of October, 1891, and that when they made the combine they made it with the intention to do so and were satisfied that they could

do so. During this period the prices were so far in their control that they could and did stifle healthy competition in the crushed granite trade in the St. Louis market, and did extort from consumers purchasing in the said market large amounts of crushed granite sold them at prices far in excess of the prices which would have been naturally normal, if such combination had not existed. When this combination was broken by the withdrawal of one of its most powerful allies, what was left of the combine immediately reduced the price of crushed granite, which fell to its normal figure established by the competition in the market which had practically ceased to exist while the combination held together in its integrity.

"On the nineteenth of October, 1891, the Schneider Granite Company wrote to the St. Louis Crushed Granite Company the following letter:

" 'Dear Sirs:

" 'Our attorneys have advised us that the agreement entered into on the fifth day of March, 1891, between our company and the St. Louis Crushed Granite Company, is in conflict with the provisions of the act of the Missouri General Assembly, approved April 2nd, last, providing for the punishment of pools, trusts, etc., to control prices, etc., and that if we continue further to comply with the terms of our agreement not only will we be subjected to the payment of large penalties and the charter of our company be declared forfeited by the courts, but that such compliance may be used as a defense to any suit that we may hereafter be compelled to bring arising out of the large contracts for granite, etc., which our company is filling.

" 'We therefore respectfully notify you that we shall no longer recognize the agreement of March 5, 1891, as binding upon us, and shall comply no further with its provisions.

" 'Respectfully,
" 'PH. W. SCHNEIDER,
" 'President Schneider Granite Company.'

"Thereupon, the St. Louis Crushed Granite Company immediately wrote to the Schneider Granite Company the following letter:

" 'St. Louis, November 7, 1891.
" 'Schneider Granite Company,
" 'St. Louis, Mo.,
" 'Gentlemen:

" 'We beg leave to inform you that at a meeting of the board of the St. Louis Crushed Granite Company held on November 7, 1891, the following proceedings were had and spread upon the record by said company, viz.:

" 'The president reported to the meeting that on October 2nd, last, an order was sent to the Schneider Granite Company to deliver one hundred tons crushed granite to the George Pickel Granite Crushing Company at Twenty-first street in this city, that compliance with said order was refused by the Schneider Granite Company, and that coupled with such refusal there was also a message to the St. Louis Crushed Granite Company that said Schneider Granite Company peremptorily refused to fill any further orders of the St. Louis Crushed Granite Company under the contract existing between these companies dated March 5, 1891. Upon consideration by the board of this report of the president, the board resolved that notice be given in writing by the president and secretary of the St. Louis Crushed Granite Company to said Schneider Granite Company, that the former company is ready to take all the crushed granite which by said contract of March 5, 1891, the Schneider Granite Company has contracted to sell to the St. Louis Crushed Granite Company, and that if the Schneider Granite Company disposes of any of its granite covered by said contract to persons or parties other than the St. Louis Crushed Granite Company,

the company last named will charge against the Schnei-
der Granite Company the penalty of one dollar per ton
on all such granite thus wrongfully disposed of by said
Schneider Granite Company in violation of said con-
tract, and that the St. Louis Crushed Granite Company
will insist upon the full payment of these penalties by
every means legal and equitable; it was also resolved
that the notification to be thus sent to said Schneider
Granite Company incorporate a copy of the foregoing
report and of these resolutions.

" 'Please advise us of the receipt by you hereof,
and oblige.

" 'Yours respectfully,
" 'J. C. Finck, Jr., President;
" 'Phil F. Stifel, Secretary,
" 'St. Louis Crushed Granite Company.'

"On October 19, 1891, the Schneider Granite Com-
pany withdrew from the combination and never recog-
nized its contract or did anything to perform it. No
further demands were made on it by plaintiff, and it
made no further deliveries under the contract.

"At the trial before the referee the defendant
made the following admission:

" 'That between October, 1891, and March, 1896,
being the date when the Schneider Granite Company
withdrew from the St. Louis Crushed Granite Company
and refused further to furnish granite, and the date of
the expiration of the contract sued on, it crushed and
sold at least sixty thousand tons of crushed granite as
alleged in the petition.'

"Between the nineteenth day of October, 1891, and
the fifth of March, 1896, the market value of crushed
granite varied from $2, a minimum, to $3, a maximum,
free on board the cars at the Iron Mountain depot in
the city of St. Louis at wholesale, viz., in carload lots.
It would be sold in smaller lots depending on the size
of the order, from $2.25 to $3.25. At the above price
it sold in the open market.

"The evidence is not sufficient to enable the referee to state what was the market price per ton each day on any specified day during that period, or to state for how many days or for what period the market was at its minimum and at its maximum. The average of the minimum and maximum of the market price per ton in carload lots f. o. b. cars in Iron Mountain depot, St. Louis, during that period was $2.50. While the evidence shows the total amount of the output of crushed granite of the Schneider Granite Company between those dates, it does not show the output for any one day or for any one period and it does not show the market price prevailing at the time of any one output, or any one sale by the Schneider Granite Company, or on the date of expiration of the five-year period of the contract.

"CONCLUSIONS OF REFEREE UNDER THE LAW AND THE FACTS.

"Plaintiff alleges that on March 5, 1891, plaintiff and defendant made an agreement by which the defendant agreed to sell and deliver to plaintiff all the crushed granite which the defendant, during the period of five years thereafter, might crush at its plant upon the·orders of the plaintiff at the price of $2 per ton free on board cars at the yards of the Iron Mountain Railroad Company in St. Louis, or at the rate of $1 per ton free on board cars at defendant's crusher; that in case of failure of defendant to conform to the agreement in respect to the deliveries of crushed granite, with certain exceptions not important in this case, the plaintiff was to be entitled to receive the sum of fifty cents a ton for the first ten days of failure and $1 per ton thereafter on all crushed granite which the defendant might neglect to deliver; that the defendant performed its contract until about the nineteenth day of October, 1891, when it declined and refused to do so, which refusal it has persisted in, although the plaintiff has been constantly ready and willing to receive and

has demanded the same from the defendant; that the plaintiff between the said nineteenth day of October and the expiration of the contract, March 5, 1896, neglected and refused to furnish plaintiff 60,000 tons of crushed granite, to its damage in the sum of sixty thousand dollars.

"The answer of the defendant, after making certain general denials, sets up the special defense that the contract also provided that the plaintiff should order from the defendant from time to time during the period of five years of the quantity of crushed granite which the plaintiff might need in its business, an amount equal to the numerical proportion which the contract might bear to the whole number of like contracts which the plaintiff has made in good faith with responsible proprietors, and that at the end of five years the plaintiff could take all the crushed granite which the defendant had at that time on hand at the prices mentioned in the contract; also that the defendant should pay to the plaintiff in its monthly settlements $1.50 per ton for all spawls which had been turned into crushed granite and used with cement which during the preceding month might have been sold by the defendant, but that no such price was to be paid where a contract similar to the one in suit existed between the plaintiff corporation and the party to whom the said spawls were sold; that the plaintiff company was a corporation organized by the chief crushed granite dealers in St. Louis for the purpose of carrying out an agreement to control all of the crushed granite offered in the market of that city, and that the said dealers were all and the sole shareholders therein; that contracts similar to the one sued on were entered into between the plaintiff and substantially all the other crushed granite dealers in the city of St. Louis, Missouri, and were made in pursuance of an agreement entered into by said dealers for the purpose of controlling the quantity of crushed granite which should be offered for sale in the

market of the city of St. Louis and for the further purpose of advancing and controlling the price by the means thereof; that until the withdrawal of the defendant from said combination on the nineteenth day of October, 1891, the parties and persons engaged therein did actually control the market and advanced and kept up the price of crushed granite; that said agreement and combination was in restraint of trade, illegal and invalid, and was in violation of the statute law of Missouri, and the Interstate Commerce law; that the defendant did notify the plaintiff on the nineteenth day of October, 1891, that it had withdrawn from the contract and the unlawful combination; that the plaintiff was not a corporation under the laws of the State of Missouri at the time of this suit.

"The answer was supported by an affidavit in due form.

"After the filing of the petition, April 12, 1898, John C. Finck, Jr., Philip F. Stifel and Gottlieb Eyermann, Jr., made a motion in the case for an order to substitute themselves plaintiffs in the case, on the ground that the charter of the St. Louis Crushed Granite Company had expired by limitation, in March, 1896, and that at that time the said parties were the officers and directors of the company.

"On June 11, 1898, the court entered an order sustaining said motion and substituted said parties as plaintiffs, but no amended petition was filed by these substituted parties. The case went to trial upon the original petition and answer.

"It will be seen from the pleadings that the defendant sets up a denial that it has sold 60,000 tons and that the plaintiff was damaged thereby in the sum of $60,000, and also the special defense that the contract sued on is void because the same is in restraint of trade, and illegal and void, and in conflict with the statutes of Missouri, and the United States, forbidding such combinations and agreements. The facts substantiating these

facts are set up. The mere statement of the illegality of the contract and its conflict with the statute are allegations of law and add nothing to the facts pleaded.

"The issues therefore are:

"First. Is the contract sued on a legal or illegal contract?

"Second. If it is a legal contract, what is the measure of damages, the defendant having admitted that it had manufactured and sold between the nineteenth day of October, 1891, and the expiration of the contract, 60,000 tons of crushed granite?

"Upon the issue whether the contract is valid or void as in restraint of trade, it is contended by the plaintiffs:

"First. That the validity of the charter of the St. Louis Crushed Granite Company can not be collaterally assailed in this suit, and that the contract of March 5, 1891, with the defendant, is merely a contract of one individual to take its entire output for a specified period, and, therefore, it is not invalid under the principles of common law.

"Second. That the contract is not illegal by virtue of any statute of Missouri; that the statute of 1889 of the State of Missouri against pools, conspiracies and trusts which went into force on March 5, 1889, was unconstitutional, and was so held by the Supreme Court of Missouri in the case of State v. Simmons Hardware Co., 109 Mo. 118.

"That, at any rate, this statute was expressly repealed by the act of the State of Missouri of 1891, which can have no retroactive effect, and that, therefore, there is no statute of Missouri under which the contract can be held to be illegal.

"Taking up these propositions separately, the referee is of the opinion that the defense does not necessarily assail the validity of the charter. The validity of the contract in suit is assailed on the ground that it is in violation of the policy of the law of this State as

declared by both the common law, the statute of the
State, and the statute of the United States. It is the
use to which the corporate organization is put which is
here assailed. The corporation is a valid corporate en-
tity. It can carry out in good faith the purposes de-
clared in its articles of association, which as declared
are legitimate enough. The corporation simply departs
from these declared purposes and suffers itself to be
used as a cover for making effective a conspiracy
against the law, admitting, of course, that there is such
a conspiracy. That is the real question.

"If this is such an illegal conspiracy then the ref-
eree is of the opinion that this contract is plainly be-
yond the powers and scope of the corporation. In so
holding, no objection is made to the validity of its cor-
porate existence. It can proceed to do all things that
are legal and proper for it to do. But if it were neces-
sary, there is not wanting authority to sustain the prop-
osition that the very validity of the corporation organ-
ization may be collaterally assailed where the unlawful
conspiracy exists in the articles of association of the
corporation. This point was distinctly decided by the
St. Louis Court of Appeals in the controlling case of
National Lead Co. v. Grote Co., 80 Mo. App. 247. The
court cites ample authorities to sustain its position in
that case.

"The referee is not satisfied that the proposition
of the learned counsel for the plaintiff can be sustained,
that the combination shown in this case is not illegal
under the principles of common law. In determining
the validity at common law of such combinations and
contracts which are essential parts of them, the true
test is whether they afford fair and just protection to
the parties or whether they are so broad as to 'interfere
with the interests of the public.' [Morris Run Coal
Co. v. Barclay Coal Co., 68 Pa. St. 173; Crawford v.
Wick, 18 Ohio St. 190; Bennett v. Dutton, 10 N. H. 481;

White v. Hunter, 23 N. H. 134; Weld v. Lancaster, 56 Me. 453.]

"Certainly the combination in this case was such as to seriously injure those who wished to buy crushed granite in the city of St. Louis and the neighboring markets.

"We do not understand that the case of Wiggins Ferry Co. v. Railroad, 73 Mo. 389, announces any different principles. In that case there was under consideration a contract between the railroad company and the ferry company to give to the latter by the former all of the ferriage of its freight and passengers across the Mississippi from East St. Louis to St. Louis for a period of years. The court sustained this contract as not so far in restraint of trade as to be illegal. It said (page 411): 'The space in which the restriction is to operate is limited to the Illinois shore opposite the city of St. Louis, and is only a partial restraint in that space, the restriction being not that the defendant will not employ any ferry at all, but that it will only employ that of plaintiff. We can not say from anything appearing in the contract that such limitation is unreasonable and it is not, therefore, obnoxious to the rule.'

"The case of Gill v. Ferris, 82 Mo. 156, cited by counsel, announced the familiar proposition that: 'A contract not to engage in a particular business, at a specified place, for a limited time, is not invalid as being in restraint of trade.'

"If this contract in suit stood alone it would undoubtedly be sustained, but it did not stand alone. It was one of five others, all of which were links and necessary links in the illegal combination which rendered them illegal.

"A careful inspection of the case of Clark v. Frank, 17 Mo. App. 602, cited by plaintiff's counsel, shows that it is not in point at all.

"The case of Skrainka v. Scharringhausen, 8 Mo. App. 522, presents some features very similar to the

one at bar and was rightly decided on the particular facts before the court. But these facts in principle are radically different from those in the case at bar. The court said: 'The agreement is amongst the quarrymen of one district of one city, and it does not appear that it embraces all of them. There is no evidence that it works any public mischief, and the contract is not of such a nature that it is apparent from its terms that it tends to deprive men of employment, unduly raise prices, cause a monopoly, or put an end to competition.'

"The evidence in the case at bar shows that the combination of which the contract in suit was an essential link was intended to work and did work serious public injury and did unduly raise prices so long as it held together in its original integrity. It did tend to cause a monopoly and to restrict competition.

"The court also says on page 525: 'Where the contract injures the parties making it by diminishing their means of supporting their families, tends to deprive the public of the services of useful men, discourages industry, diminishes production, prevents competition, enhances prices, and, being made by large companies or corporations, excludes rivalry and engrosses the market—tends to make a ''corner,'' to use the slang of the stock and provision gamblers—it is against the policy of the law.'

"Taking up the second point of the plaintiff's argument, that the contract in suit violates no statutory law of the State of Missouri, we find that the State of Missouri passed an act on May 18, 1889 (Laws 1889, p. 96), which provides that if any association of persons, corporation or partnership, 'shall create, enter into, become a member of or a party to any pool, agreement, combination, confederation, or understanding with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of or a party to any

pool, agreement, contract, combination or confederation
to fix or limit the amount or quantity of any article,
commodity or merchandise to be manufactured, mined,
produced or sold in this State, they shall be guilty of
a conspiracy to defraud.' This act remained in force
until the law of 1891, approved on April 2, 1891 (Laws
1891, p. 186), expressly repealed the act of 1889, but by
the act of 1891 the State of Missouri re-enacted that por-
tion of the act of 1889 which has just been quoted in
almost identically the same terms. The combination
which appears in the suit at bar is undoubtedly con-
demned as unlawful by the express terms of both of
these acts.

"The referee can not agree with the learned coun-
sel of the plaintiff that the law of 1889 was declared
void in the case of State ex rel. v. Simmons Hardware
Co., 109 Mo. 118. So far from holding the law uncon-
stitutional and void in that case the Supreme Court of
Missouri impliedly held it good, for in that case the
Simmons Hardware Company was prosecuted because
it had failed to make a certain declaration under oath
to the Secretary of State which was required by one of
the sections of the law of 1889. The court might have
held that the defendant was not guilty, because the
whole law was unconstitutional and void, but it did not
do so. On the contrary, it held that the defendant was
not guilty because the law being valid made certain
things unlawful and imposed certain penalties for vio-
lating the law, yet required the defendant to accuse it-
self by its own sworn return of its resolution. The de-
cision was distinctly based upon the proposition that
where one is unlawfully subject to pains and penalties
and a criminal prosecution for violating a law, any pro-
vision requiring the accused to give evidence under oath
against himself showing the alleged violation conflicts
with the express prohibition of our Constitution. The
decision was predicated on the assumption that as the
law was a valid law the defendant would by its answer

subject iself to prosecution under it. That section of the law which required a sworn return by the accused being easily separable from the main body of the law, does not affect the validity of the law.

"There has not been an instant of time since the passage of the law of 1889 down to the present time when such a contract as the one sued on was not illegal and void under the express terms of one or the other of these statutes.

"By what course of reasoning, then, can it be held that this contract is valid under the statute law, assuming that it is valid at common law?

"It was certainly absolutely void under the law of 1889 up to the time of its repeal by the law of 1891. Can it be successfully contended that the act of 1891 purged it of its illegality and gave it a validity which it did not have before? The plaintiff maintains that the law of 1891 should have no retroactive effect. This is not only giving it a retroactive effect, but a most unexpected one, for the very purpose of the law of 1891 is to render such contracts illegal. Had the law of 1891 been merely a repealing act and merely repealed the act of 1889, and had the parties acted under the combination thereafter, it might possibly be contended that the combination had impliedly readopted the agreement after the repeal of the act of 1889. Of course there would be some obvious objection to such a course of reasoning, but it would be worthy of consideration.

"Assuming that the contract in suit did not conflict with the principles of the common law, or with the provisions of the law of 1889 (if such an assumption can possibly be made), yet can the plaintiff successfully contend that the contract is not illegal under the law of 1891, on the ground that so to declare it would be to give the latter law a retroactive effect? To support such a contention it is necessary to assume that the law of 1891 would be given a retroactive effect. But is this true?

"The contract is a continuous one.  The law of 1891 is based on the valid exercise of the police power of the State.  No one can have any vested right which he can claim to be exempt from the lawful exercise by the State of its police powers.  Everyone holds his property rights subject to such lawful exercise.  This proposition is established by an overwhelming array of authorities.

"In the case of Mugler v. Kansas, 123 U. S. 623, the record showed that the people of Kansas had adopted a Constitution prohibiting the manufacture and sale of beer and spirituous liquors in Kansas.  The Legislature passed an act enforcing this prohibition, in which it declared that breweries where beer and spirituous liquors were manufactured are public nuisances subject to condemnation in judicial proceedings.  The defendants were indicted under this law.  The defense contended that they had long prior to the Constitution and the law been in the business of manufacturing beer; that they had large sums invested in their manufacturing plant and business, which had been invested in good faith under the guarantees of the laws then existing; that the enforcement of this law against them amounted not only to a partial, but a total confiscation of their property and property rights.  This view was urged in the Supreme Court of the United States with an earnestness and ability hardly ever surpassed.  The court in a learned and exhaustive opinion reached the conclusion that the law had been passed in the valid exercise of the police powers of the State and 'that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and 'if the public safety and morals require the discontinuance of any manufacture or traffic, the hand of the Legislature can not be restrained in providing for its discontinuance by any incidental inconvenience which individuals or corporations shall suffer.'

"The identical question which is involved in the

suit at bar was passed upon in the case of United States
v. Freight Association, 166 U. S. 290, in which it was
held that an agreement entirely similar to the one at
bar was a continuing one, and though legal when made,
'the continuation of the agreement after it had been de-
clared illegal, becomes a violation of the act.' The case
arose under the act of the United States relating to
pools, trusts, conspiracies, etc., in restraint of trade.
[See, also, Ford. v. Chicago Milk Shippers' Assn., 115
Ill. 166.]

"Under the construction which the referee gives
to the contract in suit the defendant was to deliver on
demand its proportional share (one-fifth) of the amount
which the plaintiff should need from time to time in its
business at the stipulated prices, and the plaintiff
agreed to pay for all the crushed granite manufactured
by the defendant which it should have on hand at the
end of the five-year contract, over and above that which
should have been called for by the plaintiff.

"It was the duty of the plaintiff from time to time
to demand from the defendant its proportional quota
of what the plaintiff needed in its business. In case the
defendant had manufactured such an amount, it would
have been the duty to have delivered it to the plaintiff
as demanded. Had it failed to do so, the plaintiff then
would have been entitled to demand from the defendant
the difference between the contract price and the mar-
ket price prevailing at the time of the demand.

"In determining whether a provision similar to
the one in the contract in suit is intended as liquidated
damages, the intent controls, and is to be gathered from
the whole instrument and the surrounding circum-
stances. [Tinkham v. Satori, 44 Mo. App. 659, and
cases cited.]

"The referee is of the opinion that the stipulation
in this contract is what the contract describes it, 'a pen-
alty,' though the use of the word 'penalty' is by no
means conclusive of the question.

"The plaintiff failed to show that the St. Louis Crushed Granite Company made any demand from time to time upon the defendant to deliver to it its quota of what it needed in its business. They failed to show what was said quota at various times. They failed to show what the market was at any specified time or on the day of the expiration of the contract. The plaintiffs did show that the market price of crushed granite in carload lots f. o. b. cars, Iron Mountain depot, St. Louis, during the period ranged from $2, the minimum, to $3, the maximum, and the referee does find the market value during that period did so range. But he is unable to find from the evidence what was the market value on any particular day, or what it was on the day of the expiration of the contract. From this state of the evidence the referee can not report what the plaintiff should be entitled to recover on the assumption that the court will disagree with his conclusions, and hold that the contract sued on is legal, and that recovery can be had upon it. The referee can make no other recommendation as to judgment on that assumption than that the plaintiff is entitled to recover a judgment for one cent damages. But the referee is of the opinion that, for the reasons herein stated, the contract sued upon is illegal and void, and that the plaintiff can not recover at all, and recommends this court to enter up a judgment in favor of the defendant against the plaintiffs."

The finding of facts by the referee is well supported by the evidence, and in his conclusion of law that the contract sued on is illegal for the reasons stated in the report, we concur; and as this will lead to an affirmance of the judgment of the circuit court, it becomes unnecessary to consider the alternative ruling of the referee on the measure of damages, upon which we express no opinion.

The judgment of the circuit court is affirmed. All concur, except *Lamm, J.,* not sitting.