**MORSE–STARRETT PRODUCTS CO. v. STECCONE.**

**No. 27081–E.**

United States District Court
N. D. California, S. D.

Oct. 25, 1949.

798

Mellin and Hanscom, Oscar A. Mellin, Jack E. Hursh, San Francisco, Cal., attorneys for plaintiff.

I. M. Peckham, James M. Naylor, San Francisco, Cal., attorneys for defendant.

ERSKINE, District Judge.

Most, if not all of the facts in this case, are virtually admitted. The difficulty in deciding this action stems more from the confusion in the decisions which are or are claimed to be applicable. The plaintiff's action is based upon a claimed infringement of a trademark registered under the Acts of 1905, 33 Stat. 724, and 1946, 15 U.S.C.A. § 1051 et seq., and alleged unfair competition arising by virtue of the use of that trademark by defendant. The defendant filed an answer and cross-complaint denying many of the averments of the complaint, claiming that the right to use the trademark in dispute is solely that of defendant, and asking for an injunction against its use by plaintiff, and for damages claimed to have been suffered by defendant because of plaintiff's alleged unauthorized use of said trademark.

The salient facts are as follows:

The defendant states that in 1934 he invented the window squeegee, a device for window cleaning, and started making and selling it in January, 1935. (On Page 17 of his deposition defendant says he commenced to make and sell them 16 months before November, 1938. But this discrepancy between his statements at the trial and in his deposition is immaterial and is explained by his further statement that after the deposition was taken he found an order for a squeegee sold by him dated January, 1935). Defendant before January, 1935 had been a window cleaner both in the San Francisco bay area and in the East. He was an organizer, charter member and perpetual vice-president of the East Bay local of that trade union, and a delegate to their state and national conventions. After inventing the "squeegee" he applied for and was granted a United States patent on the device. He began his manufacturing operations under the name of "New Deal Manufacturing Co., E. Steccone," and impressed on the metal handles the words "New Deal Patent Pending". He did not mark the rubber part of the squeegee. He continued making and selling those squeegees with the handles marked "New Deal" until December, 1938. During this period he circularized the trade throughout the United States soliciting the sale of his product under the name of "New Deal."

In November, 1938 he licensed the manufacture and sale of this patented device to plaintiff subject to the cancellation or disposal of his previous contract with one Dormeyer. When it became apparent the Dormeyer contract could not be disposed of, the defendant on December 3, 1938 entered into a supplemental license agreement with plaintiff wherein he indemnified plaintiff against all loss which plaintiff might suffer by reason of the Dormeyer contract. Upon the making of these two contracts and pursuant to the terms therein, defendant turned over to plaintiff, at cost less depreciation, his dies, tools, material and equipment used in the making of the squeegees. He also gave plaintiff his customers list and retired from the business.

Defendant admits he had never used the disputed trade mark "Steccone", or his own name in any form, on his squeegees prior to his license agreements with plaintiff. His business had been identified as "New Deal Manufacturing, E. Steccone", and the

metal handles of the squeegees had been marked "New Deal," and had been advertised and sold under that name. Several witnesses for plaintiff from San Francisco, Oakland and San Jose testified they had followed the occupation of window cleaner and had known defendant for many years; that he had invented the squeegee in question; and that although it was marked "New Deal", whenever they purchased a squeegee from a dealer they asked for and called it the Steccone squeegee. These statements related to the years from 1935 to 1938.

After the agreement of December 3, 1938, and on or about January 1, 1939, plaintiff commenced to make and sell the device invented by defendant pursuant to the license agreements of November and December, 1938. At or about this time the officials of the plaintiff discussed the name under which they would sell the squeegee. They decided to dispense with the term "New Deal" and to adopt the name "Steccone". They told the defendant that this was their purpose. He made no objection. According to Paul, one of plaintiff's officials, they did not ask Steccone if it were agreeable to him, but told him this was their intention, and he made no objection. Morse, the president of plaintiff company, stated he talked to defendant shortly after the license agreement of December, 1938 was obtained, told defendant that he did not like the name "New Deal", and suggested it be called "Steccone"; the defendant was pleased and agreed. Morse further stated that nothing was said about how long that mark could be used, but he understood it was to be as long as his company made and sold the squeegee. Paul says that one of the reasons which actuated them in calling the article "Steccone" was the fact that there was another squeegee on the market called "Ideal", and it was desired to prevent any confusion about the articles. Morse stated he thought it would please defendant. Defendant contends in his briefs that the reason plaintiff adopted this name was that the article was already known to the public as the "Steccone" squeegee, although it was marked "New Deal" squeegee. At any rate it is conceded by both parties that when plaintiff adopted the mark "Steccone" and impressed it upon the rubber squeegee itself, as well as on the handle, and thus sold the article, defendant raised no objection.

At the time defendant was told plaintiff intended to use this mark nothing was said about the length of time it could be used. There was no written agreement respecting its use. Nothing appears in the license agreements or in the letter of December 12, 1938 transferring the inventory, dies, and equipment from defendant to plaintiff respecting its use or the use of any trademark. Apparently no consideration passed from plaintiff to defendant for its use, if such consideration were necessary. Nothing was said about registering the mark. Nothing was said about the transfer of the business or good will, if any, by defendant to plaintiff.

Early in 1939 plaintiff procured a rubber stamp and red ink and proceeded to cut and stamp the rubbers used in the squeegee with the mark, which consisted of the name "Steccone" enclosed in a red oval. About the middle of July, 1939 plaintiff commenced to impress the same mark on the metal handles of the squeegee. Plaintiff has continued to so mark the rubbers and handles of the squeegees up to the present time. On June 13, 1939 plaintiff applied under the Trade Mark Act of 1905 for registration of the mark Steccone with an oval around the name. On October 3, 1939 this mark was registered in the Patent Office. According to defendant this registration was obtained without his knowledge or consent.

On October 31, 1940 the Circuit Court declared the defendant's patent invalid for lack of novelty and for anticipation. Morse-Starrett Products Co. v. Standard American Window Safety Device Co., 7 Cir., 115 F.2d 574.

It will be noted that plaintiff herein was also plaintiff in that action, attempting to uphold the validity of the patent and thus the validity of its license from defendant under which it had manufactured and sold the squeegees for nearly two years. After this decision, and on or about November

13, 1940, plaintiff by letter cancelled the license agreement because of the annulment of the patent. So far as the record shows, defendant made no objection to this cancellation or to the plaintiff's continuation in the business of making and selling the squeegee under the name "Steccone" until approximately two years later. On October 16, 1942 defendant caused a letter to be written to plaintiff demanding that it discontinue using the name "Steccone" on the squeegee. In the meantime, approximately a two-year period, plaintiff continued to manufacture, advertise and sell the device nationally under the trademark "Steccone". Defendant explains his delay from November, 1940 to October, 1942 in demanding that plaintiff discontinue the use of the trademark by saying he realized plaintiff had on hand a stock of goods marked "Steccone", and he thought it was no more than right to allow plaintiff to get rid of them. He did not, however, convey this idea to plaintiff. Upon receipt of this letter of October 16, 1942 plaintiff caused defendant to be notified that plaintiff had registered the mark and would not discontinue its use.

Sometime in 1945 defendant claims he decided to embark again in the manufacture and sale of this squeegee. This was three years after the exchange of letters between plaintiff and defendant above referred to, during which time plaintiff had continued making, advertising, and selling its product throughout the United States under the name "Steccone". Defendant contends he then applied to Goodrich Tire Co., his former supplier, to make the rubbers with his name "Steccone" on them, but that Goodrich refused to do so on the ground that plaintiff claimed the mark. Plaintiff had notice of this action by defendant because in July, 1945 Goodrich who was making the rubbers for plaintiff advised plaintiff that defendant had requested Goodrich to make rubbers for him and mark them "Steccone". Plaintiff advised Goodrich that it owned the mark and guaranteed Goodrich against any liability for continuing to make and mark the rubbers for it.

Between 1945 and 1947 there were no further developments except for defend-ant's efforts to get rubber for his squeegee. Various manufacturers thereof offered to sell to him, but he declined to purchase because he felt the material was unsatisfactory. Prior to March 28, 1947 defendant contacted the American Rubber Manufacturing Company in Emeryville, California, to manufacture the rubber desired by him. On March 28, 1947 the attorney for plaintiff wrote that company protesting its manufacture of squeegees for the defendant bearing the mark "Steccone", on the ground that plaintiff owned the mark. Prior to March 28, 1947 defendant also had made arrangements with the "Direct Mail Advertising Service" of Oakland to circularize the window cleaning trade respecting the squeegee proposed to be made and sold by defendant under the firm name of Steccone Products Co., using the trademark "Steccone". On that date plaintiff's attorney wrote a letter to the above-mentioned concern protesting the use of the mark "Steccone". On April 4, 1947 plaintiff filed this action. On May 20, 1947 defendant filed his answer and cross-complaint.

We are thus faced with a situation involving several years of continued and increasing effort by plaintiff to expand the sale of this article under a particular trade name. On the other hand we have a defendant who failed with but minor exceptions to take any affirmative step to halt what he alleges was an unauthorized use of his name. It appears that defendant was notified in November, 1940 that the license was cancelled. He knew almost two years previous that plaintiff was using the mark. He knew, or should have known, from November, 1940 that plaintiff was expending considerable sums of money in making, selling and advertising this article as the "Steccone" squeegee. He also knew at various times that plaintiff was taking steps to prevent defendant from doing the same. Despite such knowledge defendant allowed plaintiff to continue to make and push the sale of the squeegees at considerable cost and expense. Until October 16, 1942 he said nothing. Subsequent to the letter of October 16, 1942 he did nothing in the way of affirmative action until his cross-complaint was filed in May, 1947.

During the entire period from January, 1939 until May, 1947 defendant took no legal action to claim that this mark was his own.

Defendant excuses this seven-year delay in taking any affirmative legal action upon two grounds. (1) As heretofore stated, that he did not even write a protest letter until October, 1942 because he thought it fair to let plaintiff get rid of its stock on hand. (2) That from 1942 until 1945, because of the war effort, there was no rubber available satisfactory to him, so he made no attempt to go into the business of manufacturing these particular squeegees. No explanation is given for the delay between 1945 and 1947 except the fact that Goodrich, in compliance with plaintiff's demands, refused to make and mark the rubbers defendant desired.

It may be true that between November, 1940 and October, 1942 defendant did nothing because he thought that during this approximately two-year period plaintiff would be able to sell whatever goods it had on hand marked "Steccone", but he never so advised plaintiff. Moreover, he did not during said period tell plaintiff not to push the sale of the article under that name after plaintiff had used up the articles so manufactured and marked prior to November, 1940.

It also may be true that defendant desisted from going into the same business from October 1942 to 1945 or 1947 because of the national inhibitions against the use of the type and grade of rubber he felt was necessary for his squeegee, but he never so advised plaintiff. Defendant claims that from April, 1942, pursuant to orders of the War Production Board, until May 2, 1947 the use of synthetic or scrap rubber or any rubber at all for squeegees was prohibited, and that at the same time the Board prohibited the manufacture of handles for squeegees out of cooper, brass, or steel, or alloys thereof, and that accordingly he was prevented, without his fault, from manufacturing and selling the article.

On the other hand the testimony of defendant's own witnesses was that during the period from 1942 to 1947 rubber for squeegees was available to defendant from them, but that he objected to the quality thereof. One of these witnesses stated that the rubber used by plaintiff was inferior to that which defendant desired.

Regardless of the reason, defendant did not get into production until 1945 or later, while plaintiff continued to produce and sell squeegees from January, 1939 until the trial of this case in April, 1949. As will be noted hereafter, plaintiff's basic rights stem from this continuous, exclusive and ever increasing production and sale of the squeegee marked "Steccone" over this period of six to ten years. During this period the defendant made no legal effort and took no legal action to prevent plaintiff from making and selling the article under the mark "Steccone" with the exception of the letter of October 16, 1942 and his cross-complaint filed in May, 1947.

Defendant claims that some time before 1940 or 1941 he invented a flexible squeegee of a different design than those manufactured and sold by plaintiff, and that in 1940 or 1941 he commenced the manufacture and sale of them under the name of Steccone Products Co. and marked them "Steccone". Apparently the war restrictions did not prevent his making these flexible squeegees.

According to plaintiff's evidence, from January, 1939 until the date of the trial, plaintiff carried on a sales promotion campaign to build up a market for, trade acceptance of, and distribution of the squeegee manufactured and sold by it under the name of "Steccone". According to its evidence, during that period it spent in excess of $18,000 in advertising and promotion of its "Steccone" squeegee and developed an established market in 39 states and 181 cities. At the time of the trial it claimed to have 522 distributors scattered throughout the various cities in the United States, each of which had a large number of customers who are actual users of its squeegees. Even defendant admitted that plaintiff was turning out vast numbers of the squeegees as early as October, 1942. From February, 1939 to October, 1940, when the patent was declared invalid, plaintiff's sales of the squeegees amounted to $14,590, but

from February, 1939 to March 31, 1949, a few days before the trial of this action, they were in excess of $250,000. Thus, since the cancellation of the patent license agreements plaintiff has developed a nation-wide market for its squeegees marked "Steccone", and a considerable goodwill in the business of manufacturing and selling squeegees under the trademark "Steccone".

On October 13, 1947, after the commencement of this action, plaintiff filed in the United States Patent Office an application for Trade Mark Registration under the Act of 1946 for the trademark "Steccone". Said registration was issued on October 5, 1948.

■ The foregoing is a statement of the facts of this case as they appear to me. It is clear from these facts that until plaintiff, as licensee of defendant, used the mark "Steccone" there was no pre-existing trademark use of the name Steccone. It is generally held that a trademark must be used on the commodity it is designed to identify, or on its container; it must be physically affixed thereto. American Broadcasting Co. v. Wahl, 2 Cir., 121 F.2d 412; Western Stove Co. v. Geo. D. Roper Corp., D.C., 82 F.Supp. 206; 1 Nims, Law of Unfair Competition and Trademarks, 4th Ed., p. 636.

This is also significant for the reason that in the many cases relied upon by the defendant there was involved the licensing of a trademark already in existence or an express contractual agreement respecting the use of a particular mark or name. In the case at bar the use of the mark "Steccone" was built up and promoted by plaintiff after the license was given, not before.

■■ Plaintiff's primary reliance is upon his rights as owner of a trademark registered under the Act of 1905. Defendant asserts that registration of the mark by plaintiff was illegal and fraudulent because in the application for such registration plaintiff did not disclose to the Patent Office that the name "Steccone" was a surname. This contention seems irrelevant. There is nothing in the Act of 1905 which requires the registrant to disclose that the trade name in question is a sur-

name. Defendant also asserts that the trademark was not registerable because of the provision in the Act that "no mark which consists merely in the name of an individual * * * not written, printed, impressed, or woven in some particular or distinctive manner * * * shall be [registerable]." 33 Stat. 726, § 5. The mark registered by the plaintiff was the surname Steccone enclosed by a simple oval.

■ The cases seem to be in great confusion as to this requirement of "distinctiveness" in a surname used as a trademark. This court will not attempt to resolve the confusion, since it appears that a holding on this point is not necessary to grant plaintiff effective relief. Irrespective of whether a trademark has a valid registration under either the 1905 Act or the 1946 Act, if one has built up a so-called "secondary meaning" through the use of a trade name or trademark, this use will be protected by the court against unfair competition. Brooks Bros. v. Brooks Clothing of California, D.C., 60 F.Supp. 442, 450; 1 Nims, Unfair Competition and Trademarks, 4th Ed., Ch. IV and cases cited therein.

■ Defendant questions the jurisdiction of this court to determine the question of unfair competition in this case, since there is neither diversity of citizenship nor an express finding that there is a valid registered trademark. Defendant is in error in this contention. The District Courts have jurisdiction over an action asserting a claim of unfair competition, irrespective of diversity of citizenship, when joined with a substantial and related claim under trademark laws. This is the rule under Federal Court decisions (Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148) and has now been enacted into the Judicial Code, 28 U.S.C.A. § 1338. Whether state law rather than federal law must govern the issue of unfair competition, in the absence of a finding that the trademark was validly registered, need not be decided here, since no relevant distinction between federal and California law in this respect has been brought to the attention of the Court.

Under the circumstances of this case, where the charge is one of unfair competition, the rights of the parties depend upon which if either of them can show that his prior use of the trade name has built up a secondary meaning in the mind of the consuming public. If the defendant, Steccone, can show that such a secondary meaning was developed through his efforts prior to 1939, he has a right which will be protected against unfair competition, unless lost through abandonment, acquiescence, or estoppel. If no such secondary meaning was gained, or was lost, then the plaintiff, the subsequent manufacturer of the article, may show that through its efforts a secondary meaning in the name has been developed, giving it a right entitled to protection.

A secondary meaning is briefly defined in Macy & Co. v. Colorado Clothing Mfg. Co., 10 Cir., 68 F.2d 690, 692, as follows: "Words or names which have a primary meaning of their own, such as words descriptive of * * * the maker, may by long use in connection with the goods or business of a particular trader come to be understood by the public as designating the goods or business of that particular trader. Such words have a primary and secondary meaning."

In short, a trade name acquires a secondary meaning when it identifies the product in the mind of the public as that of a particular producer. The test is whether the trademark has become broadly known to the public as describing a product of certain origin. Barton v. Rex-Oil Co., 3 Cir., 2 F.2d 402, 40 A.L.R. 424.

The reason for protecting the use of a trade name which has acquired a secondary meaning as applied to a given article is twofold:

1. In attaining a secondary meaning the mark has come to signify in the public mind not only a particular article but a single source or producer of the article. Accordingly a mark having a secondary meaning will be protected by the courts in order to protect the public from confusion as to the source of the product. See: Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 83

L.Ed. 73; Bayer Co. v. U.S. Drug Co., D.C., 272 F. 505; California Apparel Creators v. Wieder, 2 Cir., 162 F.2d 893, 897, 174 A.L.R. 481.

2. In attaining a secondary meaning for a mark the owner thereof has spent energy, time, and money in creating such secondary meaning as applicable to goods of his manufacture.

Courts will protect the creator of such a secondary meaning against another's profiting from his activities, or causing him loss of sales or reputation, that is,—preventing X from reaping where Y has sown. Garrett v. T. H. Garrett & Co., 6 Cir., 78 F. 472.

These two reasons for the protection of a trademark which has a secondary meaning are well summarized in Sen. Rep. No. 1333, 79th Congress, 2nd Sess. 6 (1946) as follows:

"(1) To protect the public so it may be confident that, in purchasing a product bearing a particular trademark which it favorably knows it will get the product which it asks for and wants to get.

"(2) Where the owner of a trademark has spent energy, time, and money in presenting to the public the product he is protected in his investment from its misappropriation by pirates and cheats."

Both these reasons stem from the basic idea that a trademark or trade name represents the good will that has been built up by the user of the mark.

Plaintiff contends that the word "Steccone" was never used as a trademark until its use by plaintiff in January, 1939, and therefore it was impossible for it to have acquired a "secondary meaning" before January, 1939, as that term is used and understood in the law on the subject. It contends it is impossible as a matter of law for a "trademark" which never existed as a trademark to acquire a secondary meaning. Defendant claims that the article involved could legally acquire the secondary meaning of a "Steccone" squeegee even though it bore the purported trademark of "New Deal" squeegee when sold between 1935 and 1938. It is not necessary for this Court to pass upon this

question because in my opinion the word "Steccone" did not acquire a secondary meaning before its adoption and use by the plaintiff commencing in January, 1939. It is not disputed that defendant adopted and used the name "New Deal" for his original squeegees, and advertised and sold them nationwide under that name prior to 1939. The fact that during that period some of his friends in the bay area who knew he was the inventor thereof called them the Steccone squeegee and when buying them from dealers referred to them as such is not sufficient to establish a secondary meaning. Nor is the fact that defendant used his name on billheads and receipts when selling said squeegees during said period sufficient to establish that the article acquired a secondary meaning during that period.

■ On the other hand from January, 1939 to the time of the trial in April, 1949 plaintiff has sold the squeegee manufactured by it under the name of "Steccone", has during that time impressed the rubbers and handles thereof with the name "Steccone", and has advertised to the trade nationally that it was the maker and seller of the squeegee called by that name, and as the facts heretofore recited indicate has built up at its sole cost and expense a considerable goodwill and business as the manufacturer of that article. In short plaintiff has built up a secondary meaning which is entitled to protection.

■ In opposing plaintiff's claim to acquisition of a secondary meaning in the trade name "Steccone" defendant contends that the conversation between Morse and defendant about marking plaintiff's product "Steccone" constituted a license by defendant to plaintiff to use the trademark "Steccone" for the period of time that plaintiff operated under the patent licensing agreements of November and December 1938, and that accordingly they were joint venturees in the use of the name, and the use of the name reverted to defendant when the agreements were cancelled in October, 1940. Plaintiff contends that under the facts of this case there was no contract or license permissive or otherwise regarding the use of the name "Stec-

cone". There are several reasons why this contention of defendant cannot be sustained and plaintiff's opposing contention must be upheld. At the time the patent license agreements were entered into and plaintiff commenced to manufacture and sell the article covered by said agreements there was no trademark "Steccone" and the word "Steccone" had not acquired a secondary meaning. The mark "Steccone" up to that time had never been used in commerce. A trademark is created or acquired only by adoption thereof, applying or affixing the same to goods intended to be indicated thereby and using the same in commerce.

See: Trade-Mark Cases (Railway Co. v. Twombly), 100 U.S. 78, 82, 25 L.Ed. 550; Waldes v. International Mfrs. Agent, D.C., 237 F. 502; Walter Baker & Co. v. Delapenha, C.C. 160 F. 746, 749; Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144; Nims, Unfair Competition and Trademarks, 4th Ed., p. 626; Hopkins on Trademarks etc., 4th Ed., pp. 63-65.

■ None of these things had been done at the time plaintiff commenced the making and selling of the article under the patent license agreements. Accordingly it is difficult to see how a trademark which was not in existence could be the subject of a license, permissive or otherwise. Nearly all of the cases cited by defendant involved the licensing of a trademark already in existence, or else an express contractual agreement concerning the rights of the parties respecting the particular mark or name involved.

■ Moreover, it has frequently been said that a licensee under a patent licensor agreement can use or adopt a particular name for the product manufactured and sold by him under such agreement, and that he is entitled to protect that name as applied to such product as against the use thereof by any one else, including the licensor. 2 Callman, Unfair Competition 1067: "While it may be stated generally that a mere license without consideration is determinable at the pleasure of the licensor, yet it has been held that if the enjoyment of a license must necessarily be

and is preceded by the expenditure of money, such license then becomes an agreement on a valuable consideration, and is irrevocable. (Citing 26 R.C.L. Sec. 48). The same reasoning might apply where the mark has been established as the symbol of the licensee." Wightman & Hough Co. v. Nivois, 2 Cir., 264 F. 98; President Suspender Co. v. MacWilliam, 2 Cir., 238 F. 159.

It seems to me that the rule of these authorities and the principles expressed in Dodge Stationery Co. v. Dodge, 145 Cal. 380, 78 P. 879, govern this case.

The same conclusion would be reached even if the defendant had created a secondary meaning in the use of his name prior to the licensing agreements with plaintiff. In the light of the reasons previously noted for the protection of the secondary meaning of a trademark it would seem to follow that its use cannot be licensed to another manufacturer of the article involved. Though it has come to signify in the public mind the product of one manufacturer, when allowed to be used by another manufacturer it loses this signification and thereby loses its secondary meaning.

"It has been said that the separation of a trademark from the particular goodwill for which it stands, i. e. the goodwill of the manufacturer acquired solely through the manufacture and sale of the trademarked article—is a legal as well as a logical impossibility. So separated, the mark reverts to its original status of a mere name." 22 New York Univ. Law Quarterly 487 (July, 1948).

Moreover, the evidence discloses that the defendant at no time after the patent license agreements were made exercised any degree of control over the manufacture and sale of the article by plaintiff. If the owner of a trademark wants to license the use thereof to another and still retain as his own the enjoyment of the rights stemming therefrom, he must do so in such a way that he maintains sufficient control over the nature and quality of the finished product, over the activities of the licensee, as will enable the licensor to sustain his original position

of guarantor to the public that the goods now bearing the trademark are of the same nature and quality as were the goods bearing the trademark before the licensing, or, that the mark now has the same meaning as far as the public is concerned as it did before the licensing.

No such control was ever exercised or attempted to be exercised by defendant.

The fact that the trademark is the surname of defendant does not prevent it from gaining a secondary meaning as applied to the article manufactured and sold by plaintiff. In such a case, where to allow a person the unrestricted use of his own surname in his business would create confusion in the minds of the public, such unqualified use can be enjoined. L. E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142; Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 28 S.Ct. 350, 52 L.Ed. 616; Garrett v. T. H. Garrett & Co., 6 Cir., 78 F. 472; Landreth v. Landreth, C.C., 22 F. 41; Dodge Stationery Co. v. Dodge, 145 Cal. 380, 78 P. 879.

Furthermore, the fact that commencing in 1940 or 1941 defendant made, advertised, and sold a flexible squeegee marked "Steccone" does not militate against plaintiff's position. It does not appear that this mark on the flexible squeegee ever acquired a secondary meaning. It does not appear that the manufacture and sale thereof was sufficiently widespread or continuous for such purpose, or so as to forestall plaintiff's acquisition of secondary meaning rights through its prior use of the name.

See Dodge Stationery Co. v. Dodge, 145 Cal. 380, 78 P. 879, where plaintiff's rights in the use of the surname, built up over a seven-year period, were protected even though the defendant had used the name, his own, in connection with similar businesses for many years prior to plaintiff's adoption of the name, while defendant was temporarily associated with plaintiff's company.

For the foregoing reasons I conclude:

1. That the trademark "Steccone" has attained a secondary meaning as applied to the squeegee manufactured and sold by plaintiff.

2. That in marking and selling squeegees under the trademark "Steccone" defendant is guilty of unfair competition.

3. That plaintiff is entitled to relief from and protection against such unfair competition.

4. That defendant should be enjoined from using the trademark "Steccone" on all squeegees, or the handles thereof, made and sold by him; and from so using his name that reasonably attentive purchasers cannot readily distinguish between the products of plaintiff and defendant; provided, however, that he may make, advertise, and sell squeegees as the product of the Steccone Products Company, or as his product so long as the name "Steccone", used alone or in conjunction with other words or symbols, on the squeegees or in the written advertising thereof, is accompanied by sufficient explanatory material so as to clearly differentiate it from the product manufactured and sold by plaintiff. J. F. Rowley Co. v. Rowley, 3 Cir., 18 F.2d 700; Chickering v. Chickering & Sons, 7 Cir., 215 F. 490; Bates Mfg. Co. v. Bates Numbering Mach. Co., C.C., 172 F. 892; J. A. Dougherty's Sons v. Dougherty, D.C., 36 F.Supp. 149; Dodge Stationery Co. v. Dodge, 145 Cal. 380, 78 P. 879.

5. Since plaintiff waived its claim for damages at the commencement of the trial, no damages should be awarded.

Plaintiff should prepare findings of fact and conclusions of law and a decree in accordance with the views expressed herein.