Sam **TEMPERATO**, Respondent,

v.

Walter **HORSTMAN**, Constance Horstman, Emil M. Ehrlacher and Theresa Ehrlacher, Appellants.

No. 46651.

Supreme Court of Missouri,

Division No. 2.

March 9, 1959.

Aubrey B. Hamilton, Richard A. Hetlage, St. Louis, for appellants.

Blumenfeld & Abrams, Harold J. Abrams, Stanley M. Rosenblum, St. Louis, for respondent.

EAGER, Judge.

In this suit plaintiff sought damages for the breach of a contract which may initially be described as a "Dairy Queen" franchise for a territory in the City of St. Louis; he also sought certain injunctive relief. He recovered damages of $29,843.-60 and was given a permanent injunction. Defendants had filed counterclaims, which were ruled adversely and which will be referred to later. The case was tried to the court. After an unsuccessful motion for a new trial, defendants appealed. We would merely encumber this opinion by reciting the pleadings; they fully cover the claims and defenses, pro and con. We note at the outset, however, that one of the defenses was and is that the contract was void because in violation of the Missouri and federal anti-trust statutes. The judge who heard the evidence retired before deciding the case, and it was thereafter submitted by stipulation to the present trial judge on the transcript, briefs, and oral arguments.

We may assume that the record shows, though in part by inference and hearsay,

that a patent had been issued for a type of freezer which froze and delivered so-called "soft-cream" through a special faucet; the final product, it is said emerged in a distinctive shape with a "curl on top,"—at least where the frozen cream was visible in a cone or sundae. These freezers were used rather widely, in nearly all the states, under the name "Dairy Queen." The product was sold in cones, sundaes, shakes, pints, quarts, and possibly in other forms. The purported owners of the patent had applied for a trade-mark registration on the name, but this had been declined, expressly or by failure to issue, because of the prior registration of a trade-mark on that name to International Milk Company; that company eventually gave the holder of the Dairy Queen freezer patent a letter of nonobjection to its use of the name under certain conditions, but that agreement was made long after the controlling breach of contract involved here.

A complicated system of franchise operations had grown up in licensing the use of these freezers and of the name "Dairy Queen"; there were state franchises, district franchises and "sub-franchises," the latter being for the operation of local stores. The freezers were generally leased to the store operators, who apparently owned or leased the stores, paid all their own expenses, and paid a royalty on all the "mix" which was purchased and used in the freezers, in addition to any lump sum paid for the original contract or the territory. The "mix" was the basic dairy product used, and it was purchased from outside sources. We shall not attempt to unravel the tangled system of royalties which the witnesses tried to describe, except to say that the defendants, as other store owners, paid a royalty to their immediate contracting party or parties. There were various competing companies or systems processing and selling soft-cream products, also sometimes referred to as "soft-milk" products; these, of course, were operated under other names, such as Tasti-Freez, Zesto and Dairy Delight.

The contract now in question was executed on Sept. 2, 1948. We shall digest briefly its essential parts. William and Irene Bollini as owners "of the exclusive right to the use of the Dairy Queen Freezers manufactured under Patent No. 2080971, and the exclusive right to the use of the tradename 'Dairy Queen' in St. Louis, Missouri, and St. Louis County, Missouri; * * *" thereby sold to defendants such rights for a certain defined area in the City of St. Louis for a period of ten years, with an option of renewal; they also agreed to furnish two freezers for each store, which were to remain the property of one Harry Axene and his wife and which should also continue to be personal property. Defendants agreed: to pay $3,600 for the use of the freezers, and a royalty of 54 cents per gallon on all "mix" used; that no royalty should be cancelled or abated by reason of the expiration of the patent; that defendants would keep complete records which should be open to inspection by the Bollinis or their agents or by Axene; to make written reports and payment of royalties monthly; to erect at their own expense, a suitable building according to plans to be furnished and on an approved site; to pay all employees and all costs of operation; to maintain the "standards and cleanliness" set up by Bollini, to comply with all health and sanitation laws, and to operate for at least six months of each calendar year. We quote, in part, the following additional provisions, which were also agreed to: "that all mix and supplies, including cones, cups, containers, toppings, flavoring, coloring and like supplies and materials, shall meet the standards of quality and specifications therefor as may now or hereafter be set up by the Party of the First Part and shall be purchased only from sources approved in writing by the Party of the First Part and W. J. Lanaghan, Belleville, Ill., and these Parties reserve the right to change the list of approved sources of supply as it deems best. * * * that no product, other than Dairy Queen may or will be

sold on the premises above described without the written approval of the Party of the First Part and W. J. Lanaghan, Belleville, Ill., first had and obtained. * * * Party of the Second Part agrees that the selling price of all Dairy Queen Products may be set from time to time by the Party of the First Part, and the Party of the Second Part agrees that it will not deviate from the prices so set." Defendants did construct a building within the prescribed territory and began the operation in or about October, 1948. Under date of March 1, 1951, Bollini and his wife, Axene and his wife, and one William J. Lanaghan and his wife entered into a contract with plaintiff, Sam Temperato, by which they transferred to plaintiff all franchise rights in St. Louis City and County and in certain other territory, and their interest in the existing contracts, including that of these defendants.

Defendants operated under Bollini from the fall of 1948 until sometime in March, 1951, and under plaintiff from March, 1951, to July 14, 1951, when they repudiated the contract and so notified plaintiff. Bollini testified: that the form of contract involved here was one given to him by Axene and Lanaghan (his contracting parties and superior franchise holders) for use in his "sub-franchise" arrangements; that defendants continually complained about the amount of the royalty and that he reduced it from 54 cents to 49 cents per gallon, but they still complained; that he made no demands that defendants purchase their supplies from stated sources, but at first had to tell them "where they could buy their supplies," because they did not know; that on certain items few sources were available; that to a large extent the different stores bought from different sources; he "encouraged" a uniform paper source; that he got no "kick backs." Bollini's testimony concerning the retail prices of the products was somewhat conflicting, but, in essence, it was as follows: that there was a "suggested selling price" at all times; that he made no demands on defendants, but that a new operator might put out

either too much or too little material for his own good at a certain price, "so we have to instruct what price to charge," and that he arranged to have price lists painted in the stores "at the beginning"; that he got directives from the Dairy Queen Trade Association on prices to be charged and set; that it was his policy to have uniformity of weights and prices in that area, and he wanted the stores to be as identical as possible; that, at the outset, defendants sold malts for 25 cents and shakes for 20 cents, and he called to their attention the fact that this "was not correct as to the policy in the City of St. Louis" and that all stores, including drug stores, were charging the same prices; that they then "corrected" it; that the "policy" included Dairy Queen and "all soft cream stores"; that on one occasion he called to defendants' attention a divergence in prices on ice cream sodas; that at a regional meeting at the Lennox Hotel in St. Louis in the spring of 1950, attended by most of the Dairy Queen operators, it was mutually agreed that the cost of supplies had gone up and that in order to make a profit "you would have to get more money for your quart or pint containers," or for these products generally; that thereafter most of the St. Louis stores raised their prices. Another witness was permitted to testify that: "Mr. Bollini had told us the standard price that Dairy Queen had for their merchandise and all their stores we served had that same price * * *."

Plaintiff Temperato had some connection with "Dairy Queen" in another territory before he took over Bollini's franchise. He also held a "Tasti-Freez" franchise from and after Sept., 1950. He testified: that after he took over he promptly reduced the St. Louis Dairy Queen royalties from 49 cents to 34 cents; that he made no demands concerning the purchase of supplies or the maintenance of retail prices; that he did discuss and tried to promote a method of volume purchasing of mix from the Pet Milk Company whereby a saving of 7 cents a gallon would have been accom-

plished; under this plan all purchases would be billed to him or his nominee, 1 cent of the saving would go to his office for bookkeeping, and the other 6 cents would be split between himself and the store operators; that he held a joint meeting of Dairy Queen and Tasti-Freez operators on this proposal in April, 1951; that he discussed this with defendants almost as soon as he notified them that he had taken over; in other words, he urged them to change their source of supply on the mix, whatever may have been the reason. Defendants did not make the change, but other stores did and supposedly saved 3 cents per gallon. He further testified: that he did "look at" the prices, and that the prices were "about uniform" in Missouri; that he also suggested that defendants purchase all their paper products from "Royal Paper" because, first, these products were printed to advertise Dairy Queen, and, secondly, he could check up through that source on the volume of defendants' sales, as he could also have done through Pet Milk. One of the officials of Southern Products Company, from which defendants purchased mix, testified that Temperato asked them if they were "big enough" to handle the Dairy Queen business for Missouri, to which they (he and other officers) replied in the affirmative, and that plaintiff (and the witness) then said: " 'Well, what terms—if I would give you this business what terms can we come together on?' I says, 'What do you mean?' He says, 'I expect a kickback to the Company that I turn the business over to,' * * *" but that the witness refused to deal on that basis, and that thereafter his Dairy Queen business "started fading out." Plaintiff denied this conversation. Eventually, the plaintiff got into a violent argument with the defendants upon his insistence that they were cheating on their royalty payments. We may note at this point that there was substantial evidence that defendants had consistently purchased mix at Southern Products Company by two methods,—one on a regular charge account,

and another by purchasing for "wholesale cash," upon tickets paid at the time of delivery and without further identification. There is a fair inference that this was done to decrease the royalty payments to be made under the contract and to conceal the actual volume. On July 14, 1951, defendants discontinued the use of the Dairy Queen Freezers and notified plaintiff that he should pick up the freezers; this notice was confirmed by letter, and in turn plaintiff's counsel replied that defendants would be held liable for all royalties and for all damages due to the breach. Defendants' check for accrued royalties was returned. This suit followed nearly a year later. There was evidence that after July 14, 1951, defendants continued to use signs and advertising in and about their place of business which tended to mislead the public into believing that "Dairy Queen" products were being sold there.

■ This case was decided on the transcript and exhibits by a judge who heard no testimony. In such instances the appellate court does not accord to the trial court's findings the same deference which it would accord had that court personally heard the evidence. Pitts v. Garner, Mo., 1959, 321 S.W.2d 509. In a memorandum opinion the court noted the plan of defendants to defraud plaintiff on royalties, the admitted breach of the contract, the fact that defendants did not testify, and it generally disallowed the defense of the invalidity of the contract as "technical and legalistic" and as unsupported by proof; it also stated that the supposed proof of illegal activity rested upon the speculation and skepticism of counsel; that the price fixing and source of supply clauses were abandoned, and that there was no possibility of a monopoly; also, that the contract was severable, and that it was unnecessary to rule specifically upon the legality of the parts attacked; however, the court apparently found the contract not to be "invalid." Other matters were discussed in detail, which we need not note. Damages were assessed for all unpaid

royalties, past and future, over a ten year period, as computed on the average gallonage of mix shown by charges and by "wholesale cash" purchases. These damages covered a period of more than seven years after the breach; approximately one year of this period had not expired at the time of the entry of judgment; this portion of the damages was commuted. Judgment was entered in favor of plaintiff for $29,843.60 as damages for the breach; the judgment entry contained extensive findings, generally in line with the memorandum opinion. Therein the court apparently avoided a specific finding that the contract was valid, but found that there were no illegal activities or conspiracies and no enforcement of price fixing or of the provisions concerning the sources of supplies. The findings and judgment were also against the defendants on their counterclaim and alternative counterclaim. Defendants were enjoined from using any confusingly similar name or names or advertising matter and, generally, from "unfair competition."

It will be impractical to discuss, or even to mention, all the points argued here, pro and con. These have all been considered and many cases read, some of which led largely down byroads. The basic question here is whether this contract is illegal and void because in violation of the Missouri or federal anti-trust statutes. The applicable Missouri statutes are Sections 416.010 to 416.050 RSMo 1949, V.A.M.S. (to which revision all statutory references will be hereafter made), and the primary federal law is the Sherman Act, Title 15 U.S.C.A. §§ 1, 2; see, also, the Clayton Act, Title 15 U.S.C.A. § 14. Plaintiff's essential position, as briefed here, is that the entire contract is valid as a lawful exercise of patent rights which a state may not infringe, and that in any event the good and the bad (if any) in the contract were severable, and that the bad had been wholly abandoned, so that enforcement of the contract should not be denied. We take no further note of the evidence or the arguments concern-

ing the legality or illegality of the Dairy Queen National Trade Association; its existence and activities certainly added no luster to the legal status of this contract but, in view of our conclusions, that issue would merely encumber an already burdened opinion.

■ We have concluded that this contract is illegal and void as in direct violation of the Missouri statutes, supra. It was substantially conceded at the oral argument here that the contract was, on its face, violative of those statutes, but counsel contended, as we understood, that the broad, protective wings of the patent monopoly and the alleged abandonment of any possible illegality, saved plaintiff's position. There can be no doubt here that the Bollinis on the one hand, and defendants on the other, agreed specifically and in writing that all retail selling prices might be set by the first parties and that defendants would not deviate from those prices. This form of contract was given to Bollini by Axene and Lanaghan for his use with his sub-franchise operators; the record fairly shows that these men were the ones from whom Bollini acquired his rights. Plaintiff took over Bollini's contract with defendants, with all its infirmities and iniquities; and we think that this contract remained burdened with the acts of plaintiff's predecessor in the enforcement of such provisions, at least in the absence of a clear and unequivocal renunciation (or better, a contract amendment) which is wholly lacking here. The evidence shows that Bollini sought enforcement of the pricing provisions and the attainment of a scheme of uniform prices. Plaintiff denied all enforcement of the price-fixing provisions on his own part, but his evidence falls far short of establishing any affirmative "abandonment," if such there may be. This type of price-control provision may be described as "vertical price fixing," discussed and condemned in State ex inf. Dalton v. Miles Laboratories, Banc, 365 Mo. 350, 282 S.W.2d 564. In our case the contract itself bespoke price fixing; in the Miles

case the practice was deduced from the evidence of activities. As the court there said, our statutes are so explicit and all-inclusive that there is no room left for construction by the courts; the court said further, loc. cit. 573: " * * * Sections 416.010 and 416.020 denounce and condemn *any person* entering into *any* combination, agreement or understanding with *any other person or persons* (note the use in the disjunctive of both singular and plural) in restraint of trade or competition or to regulate, control, fix or maintain the price of any article; and, Section 416.040 is directed against *all* arrangements, contracts, agreements, combinations or understandings between *any two or more persons* designed or tending to lessen full and free competition in, or to increase the market price of, any product. * * *" It was specifically held that our statutes are not aimed solely at combinations of competitors or "horizontal" price fixing. Section 416.-040 specifically declares void "all * * * contracts * * * between any two or more persons * * * which tend to lessen * * * full and free competition in the * * * sale * * * of any product * * and all * * * contracts * * * made with a view to increase, or which tend to increase, the market price of any product * * *." Section 416.020 declares that any person who agrees with any other person to "regulate, control or fix the price of any article * * * commodity * * * bought and sold * * . * " is guilty of a conspiracy in restraint of trade and shall be punished therefor. These, together with Sections 416.010 and 416.110, must be construed together as a declaration of policy. The last cited section specifically declares that all contracts made in violation of any of the provisions of Chapter 416 are void. And see, generally, State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S.W.2d 609; State ex inf. Major v. Arkansas Lumber Co., 260 Mo. 212, 169 S.W. 145; and Finck v. Schneider Granite Co., 187 Mo. 244, 86 S.W. 213 (involving an attempt to recover under an illegal contract). The test is not whether the agreement unreasonably lessens competition or increases prices. State ex rel. Barrett v. Boeckeler Lumber Co., 301 Mo. 445, 256 S.W. 175; and these statutes would seem to permit of no exception by reason of the amount or degree of restraint or the volume of business affected. State ex rel. Kimbrell v. People's Ice, Storage & Fuel Co., 246 Mo. 168, 151 S.W. 101. It is not necessary to find a monopoly or a possibility of monopoly in order to find a violation; the statutes do not so require. We do not mean to say that a mere incidental uniformity of prices establishes, in itself, an unlawful agreement or understanding, State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S.W.2d 609. But here we have an express agreement in writing for the control of retail prices, plus at least some active steps in enforcement. The evidence also disclosed that Bollini had issued, and plaintiff had taken over, at least two other sub-franchise agreements (Rissane, April 1, 1950; Schaefering, July 18, 1950) containing identical price-fixing provisions.

Under the circumstances we need not consider whether the Sherman Anti-Trust Act (Title 15 U.S.C.A. §§ 1, 2) was violated, or whether there was a sufficient showing of interference with interstate commerce to bring that act into operation. The latter project, in itself, sometimes leads into a labyrinth of confusion and perplexity.

Plaintiff urges that the price-fixing clause of this contract is valid because of the limited monopoly afforded to the holder of the freezer patent, and that no state may detract from these rights by anti-trust laws or otherwise, citing Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 7 Cir., 154 F. 358. Actually, proof of the existence and validity of the patent here is woefully absent; we have assumed these elements because the defendants accepted a license under the patent, and we think they are in no position to question either their original licensing agreement from Bollini

or his assignment to plaintiff. Among many cases cited by plaintiff we note the following as perhaps the principal ones: United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; E. Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, and Straight Side Basket Corp. v. Webster Basket Co., Inc., 2 Cir., 82 F.2d 245. In the General Electric case, which has since been seriously questioned (United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701) it was held that the owner of a patented process for manufacturing lamps with tungsten filaments might license another to use the process in making lamps and control the original sale price of the patented article so produced. In other words, it had merely done through another what it might legally have done itself. We note, however, that the contract involved only sales of the patented article itself, and not the unpatented product of a patented article. The court was also careful to note that a patentee might not dispose of a patented article so as to control its resale price. The prior Bement case was substantially to the same effect. In the Straight Side Basket Corp. case, supra, the Court of Appeals for the Second Circuit did hold that where one licensed patented attachments for making baskets, a condition in the license giving the licensor the power to determine the sale prices of the baskets was lawful as a valid exercise of the patent rights. However, so far as we can find, the case stands wholly alone and is out of harmony with the principles announced in other federal cases. See, specifically, Barber-Colman Co. v. National Tool Co., 6 Cir., 136 F.2d 339, 344; Cummer-Graham Co. v. Straight Side Basket Corp., 5 Cir., 142 F.2d 646, 647, certiorari denied 323 U.S. 726, 65 S.Ct. 60, 89 L.Ed. 583 (involving the same patent); United States v. General Electric Co., D.C.N.Y., 80 F. Supp. 989, 1005; United States v. General Electric Co., D.C.N.J., 82 F.Supp. 753, 814. The courts in the Barber-Colman, Cummer-Graham and General Electric (D.C., 82

F.Supp. 753, 814) cases expressly disapproved the Webster decision. And the court which rendered that decision stated later, in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 438, that the subject was "in flux." The holdings of such cases as Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; and International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, clearly proscribe all right to control and regulate, or to require the use of, unpatented materials in connection with patent-licensing agreements. And it is our conclusion that the federal decisions do not permit a patentee to control or fix the sale prices of the products of a patented machine in the hands of a licensee. So, assuming here the existence of a patent and its validity, we hold that the so-called patent monopoly did not justify or validate the price-fixing provisions of this contract.

We consider now certain other provisions of this contract. The provision that all materials used should "meet the standards of quality and specifications" set up by party of the first part was, in itself, valid, and the first party might and should have provided such standards and specifications as he deemed necessary. The remainder of the provision, to the effect that all supplies should be "purchased only from sources approved in writing by the party of the First Part and W. J. Lanaghan, Belleville, Illinois, and these parties reserve the right to change the list of approved sources of supply as it deems best" goes entirely too far; obviously, this has implications beyond a mere quality control and we hold that it constituted an unlawful restraint of trade and of competition under the Missouri statutes; specifically, it certainly would "tend to lessen * * * full and free competition * * *" in violation of § 416.040. We have read many

authorities cited by plaintiff as justifying "quality control" provisions in connection with the licensing of a trade-mark or trade-name. See, for instance, E. I. Du-Pont De Nemours & Co. v. Celanese Corp. of America, 167 F.2d 484, 33 C.C.P.A. 1061, 3 A.L.R.2d 1213; Green v. Electric Vacuum Cleaner Co., Inc., 6 Cir., 132 F.2d 312; Coca-Cola Co. v. State, Tex.Civ.App., 225 S.W. 791; Grismore, Assignment of Trade Marks, 30 Mich.Law Review 489; Callmann, Unfair Competition and Trade-Marks (1950), Vol. 3, §§ 65.1, 65.2; Morse-Starrett Products Co. v. Steccone, D.C.Cal., 86 F.Supp. 796, 805. In this field we do not concede that federal authorities are controlling, if in conflict with our statutes. The right to the use of a trade-name or mark, though it be subject to federal registration, does not arise from that registration or from federal law, but from a prior, exclusive appropriation and user under the common law. E. F. Prichard Co. v. Consumers Brewing Co., 6 Cir., 136 F.2d 512, 518. And the registration is merely "prima facie evidence" of the right. Prichard, supra. But, even so, we find no authorities, federal or otherwise, which uphold provisions so broad as those present here, which gave to the licensor and a third person full power to *designate* and to *change* the actual sources for any and all supplies used. It is not necessary to consider the discussion of "tying" agreements as used in connection with licenses issued under patents, though the point is covered pro and con in the briefs; some of those authorities are referred to above in our discussion of the price-fixing clause. We find that the last quoted provision of this contract is illegal and void under the Missouri statutes. The provision that "no product, other than Dairy Queen may or will be sold on the premises * * * without written approval * * *" has been seriously questioned in the briefs. We shall not burden this opinion with a discussion of it.

Counsel for plaintiff urge that the questioned provisions, if illegal, are severable from the remaining parts of the contract, that they were abandoned, and that plaintiff is entitled to relief, particularly in view of defendants' fraud in the payment of royalties. This record does not support a finding of "abandonment." Plaintiff took over this contract tainted with its inherent illegality and with what had been done by his predecessor to enforce it; he did nothing to change or amend it affirmatively, and some of his actions at least bordered upon the enforcement of the "sources of supply" provisions. The doctrine of abandonment, as urged here, sometimes called "purging," seems to be confined to patent infringement cases where the patent owner is found, in equity, to have fully abandoned a prior illegal restraint and to have dissipated its results, he then being permitted to proceed. Sylvania Industrial Corp. v. Visking Corp., 4 Cir., 132 F.2d 947; Campbell v. Mueller, 6 Cir., 159 F.2d 803; Westinghouse Electric Corp. v. Bulldog Electric Co., 4 Cir., 179 F.2d 139. The facts of those cases and the general application of the doctrine render it inapplicable here. In those cases the courts had a continuing jurisdiction to maintain the state of "purge"; in our case plaintiff sought and obtained substantial damages for a breach of contract, not for an infringement, and his position must stand or fall on the status quo as of July 14, 1951.

■ Our statutes, as indicated (see particularly § 416.110) declare to be *void* "all contracts or agreements made in violation of any of the provisions of this chapter * * *." We have held that this contract did violate those statutes in at least two respects. The statutes contain no exceptions or qualifications. We need not delve into the technical aspects of severability or non-severability, or into the legality of the consideration; such might be necessary in the absence of a declared public policy and public interest. We hold that a total illegality is the price here of inserting such provisions in violation of our statutory public policy. We note by way of analogy the case of Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67

S.Ct. 416, 91 L.Ed. 374, involving the federal anti-trust statutes; there one party had granted a patent license for the manufacture of baking pans by means of the patented process and on a royalty basis; ' the agreement contained pricing provisions which were held to be illegal. It was also held that the whole contract was illegal since the agreement to pay royalties and the agreement to sell at prices fixed by the other party were not severable. And see also McGregor v. Westinghouse Elec. & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380; Park-in Theatres v. Paramount-Richards Theatres, D.C.Del., 90 F. Supp. 730; Hazelton v. Sheckells, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939.

■ We entertain no illusions here concerning the conduct of the defendants. We find that there was substantial evidence of cheating in the royalty payments by purchasing mix for "wholesale cash" with no charge entries, and by false reports. We wholly fail to see, however, how this fact can eliminate the basic illegality of the contract itself, and we hold that it does not. In so holding, we are not giving aid to the defendants, as plaintiff's counsel would seem to imply; we are merely refusing to enforce the contract on the grounds of public policy, and not as an aid to the defendants, or as a matter of private right. See United States v. Bayer Co., D.C.N.Y., 135 F.Supp. 65.

■ The trial court enjoined defendants from using the name "Dairy Queen," or any name confusingly similar thereto, and from using any advertising, signs or paraphernalia which were the same as, or confusingly similar to, those of plaintiff. We find that the evidence justified the injunctive relief, regardless of the illegality of the contract; the conduct of the defendants which gave rise to the injunction occurred after they repudiated the contract. That part of the judgment will be affirmed.

■ The only matters remaining to be considered are the counterclaim and alternative counterclaim of the defendants. In the counterclaim they seek treble damages, computed upon all sums paid by them pursuant to the contract, both to plaintiff and his predecessors. In the view we take, defendants were active parties to the illegality of this contract, in "pari delicto" so to speak, and they are entitled to no relief upon their complaint of its illegality. Such is not the intention of § 416.090 providing for treble damages; we shall not permit the active participants in a forbidden contract to recover damages, treble or otherwise, against the other party on account of the very act of illegality in which they themselves have engaged. Bersch v. Fire Underwriters' Ass'n, of St. Louis, Banc, Mo., 241 S.W. 428. Generally, the parties to an illegal contract will be left in the position where they put themselves, and the law will not afford affirmative relief to either. Gilbert v. Edwards, Mo.App., 276 S.W.2d 611, 620, and cases cited; Donovan v. Kansas City, 352 Mo. 430, 175 S.W.2d 874, 179 S.W.2d 108. A distinction is sometimes made between executed and unexecuted contracts. Murray v. Murray, Mo., 293 S.W.2d 436; Pearl v. Interstate Securities Co., 357 Mo. 160, 206 S.W.2d 975. This contract had been executed in so far as defendants had made payments thereon and actually operated thereunder, and neither party is entitled to any relief. The alternative counterclaim asserted a breach of the contract by the installation of a competing business in defendants' territory and by other interference with their business and rights under the contract. Of course, defendants will not be permitted to recover damages based upon the contract which we have already held to be wholly illegal.

The judgment for damages in favor of plaintiff and against defendants is reversed; the judgment awarding a permanent injunction against defendants, and the judgment against defendants on their counterclaim and alternative counterclaim are affirmed. It is so ordered.

All concur.